**Gary Clinton DICKEY, Plaintiff,**

v.

**ALABAMA STATE BOARD OF EDUCATION et al., Defendants.**

Civ. A. No. 2593–N.

United States District Court
M. D. Alabama, N. D.

Sept. 8, 1967.

---

Morris Dees, Jr., Montgomery, Ala., for plaintiff.

MacDonald Gallion, Atty. Gen., and Leslie Hall, Asst. Atty. Gen., State of

Alabama, and James Garrett of Rushton, Stakely & Johnston, Montgomery, Ala., for defendants.

## ORDER

JOHNSON, Chief Judge.

Gary Clinton Dickey, a citizen of the United States and a resident of this district, was, for the 1966–67 school year, a student in good standing at Troy State College, a state-operated public institution of higher learning located at Troy, Alabama, which is controlled and supervised by the Alabama State Board of Education.[1] Dickey had earned as of the end of the school year in June, 1967, 147 quarter hours toward a degree in English, which degree requires 192 quarter hours, acccording to Troy State standards. He made known his wishes to attend Troy State College for the school year 1967–68, commencing September, 1967, by giving written notice as required by the institution. On July 18, 1967, Dickey received "Official Notice of Admission" from the college, admitting him to the undergraduate division of said college for the fall quarter 1967. On August 11, 1967, Dickey received a certified letter from Troy State College, signed by the Dean of Men, advising him that the Student Affairs Committee at said college had voted not to admit him "at this time."

Upon the verified complaint filed with this Court on August 16, 1967, and the matters alleged therein, this Court observed that, in cases involving suspension or expulsion of students from a tax-supported college or university, due process requires notice and some opportunity for a hearing before suspension or expulsion. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961). It was further observed in said order that, upon Dickey's verified allegations of deprivation of constitutionally guaranteed rights and where there is

factual evidence of a clear and imminent threat of irreparable injury, judicial action was required. Accordingly, the defendants were, by formal order made and entered on August 17, 1967, directed to rescind the action suspending or expelling Dickey without any notice of hearing and to afford him an administrative hearing as required by the constitutional principle of due process. Following the order of this Court, the defendants on August 21, 1967, caused to be rescinded the action taken by the Student Affairs Committee that resulted in Dickey's suspension, and at that time advised Dickey that he would be afforded an opportunity to be heard "on the charge of insubordination resulting from his refusal to comply with specific instructions of his Faculty Advisor in defiance of such instructions" and that such a hearing would be conducted on Friday, August 25, 1967. A full hearing was afforded Dickey before the Student Affairs Committee on that date. Dickey was present with his attorney, and witnesses appeared and were examined. On August 28, 1967, Troy State College, acting through its Dean of Men, advised Dickey that it was the decision of the Student Affairs Committee that he not be admitted to Troy State College for one academic year (nine months), beginning with the fall quarter of 1967. Upon receipt of this notice, Dickey moved for a preliminary injunction on the theory that his substantive rights of due process had been and were being deprived by reason of his expulsion and/or suspension from Troy State College.[2] Jurisdiction of this Court was invoked pursuant to 28 U.S.C. § 1331. Due notice of the hearing upon the plaintiff's motion was given the defendants, and the matter is now submitted to this Court upon the pleadings and the evidence taken orally before the Court.

During the early part of the 1966–67 school year, Gary Clinton Dickey, while

---

1. Title 52, § 14 and § 438, Code of Alabama (1940) (Recomp.1958).

2. Counsel for Dickey acknowledged orally in open court that his client had been, after this Court's order of August 17, 1967, accorded procedural due process by the Troy State officials.

a full-time student at Troy State College, was chosen as an editor of the Troy State College student newspaper, The Tropolitan. It appears that Dickey was an outstanding student, as he was also chosen as editor-in-chief of the Troy State College literary magazine; was copy editor of the college's annual student yearbook, and was editor-in-chief of the student handbook. He was also a member of a national honorary journalism fraternity.

In early April, 1967, Dr. Frank Rose, President of the University of Alabama, came under attack by certain Alabama state legislators for his refusal to censor the University of Alabama student publication, "Emphasis 67, A World in Revolution." "Emphasis 67," as published for the University of Alabama, served as the program for a series of guest speakers and panel discussions held in March at the University of Alabama. The publication contained brief biographical sketches of the participants, which included Secretary of State Dean Rusk, James Reston of The New York Times, and Professor Robert Scalapino, a leading authority on Asian politics. The theme of the "Emphasis" program was a "World in Revolution." In carrying out this theme, "Emphasis" published excerpts from the speeches of Bettina Aptheker, a Communist who gained notoriety at the University of California, and Stokely Carmichael, President of the Student Nonviolent Coordinating Committee and an incendiary advocate of violent revolution. To give a balanced view of a "World in Revolution," "Emphasis" carried articles by leading anti-revolutionaries such as General Earl G. Wheeler, Chairman of the Joint Chiefs of Staff. After public criticism by certain Alabama legislators, Dr. Rose, in the exercise of his judgment as President of the University of Alabama, took a public stand in support of the right of the University students for academic freedom. Criticism of Dr. Rose for this position by certain state legislators became rather intense. The newspapers widely publicized the controversy to a point that it became a matter of public interest throughout the State of Alabama.

Editor Dickey determined that the Troy State College newspaper, The Tropolitan, should be heard on the matter. He prepared and presented to the faculty adviser an editorial supporting the position taken by Dr. Rose. He was instructed by his faculty adviser not to publish such an editorial. Dickey then took the editorial to the head of the English Department at Troy State College. The head of this department approved the publication of Dickey's proposed editorial. Upon returning to the faculty adviser, Dickey was again informed that the editorial could not be published. Dickey then went directly to the president of the college, Ralph Adams, who also determined that the editorial could not be published. It is without controversy in this case that the basis for the denial of Dickey's right to publish his editorial supporting Dr. Rose was a rule that had been invoked at Troy State College to the effect that there could be no editorials written in the school paper which were critical of the Governor of the State of Alabama or the Alabama Legislature. The rule did not prohibit editorials or articles of a laudatory nature concerning the Governor or the Legislature. The rule has been referred to in this case as the "Adams Rule." The theory of the rule, as this Court understands it, is that Troy State College is a public institution owned by the State of Alabama, that the Governor and the legislators are acting for the owner and control the purse strings, and that for that reason neither the Governor nor the Legislature could be criticized. The faculty adviser furnished substitute material concerning "Raising Dogs in North Carolina" to be published in lieu of Dickey's proposed editorial. Upon being furnished the editorial on the North Carolina dogs, Dickey, as editor of The Tropolitan, determined that it was not suitable, and, acting against the specific instructions of his faculty adviser and the president of the college, arranged to

have—with the exception of the title, "A Lament for Dr. Rose"—the space ordinarily occupied by the editorial left blank, with the word "Censored" diagonally across the blank space. In addition to this conduct, Dickey mailed the censored editorial [3] to a Montgomery newspaper. All parties in this case concede that the editorial is well written and in good taste. However, the evidence in this case reflects that solely because it violated the "Adams Rule," Dickey's conduct, in acting contrary to the advice of the faculty adviser and of President Adams, was termed "willful and deliberate insubordination." This insubordination is the sole basis for his expulsion and/or suspension.

 It is basic in our law in this country that the privilege to communicate concerning a matter of public interest is embraced in the First Amendment right relating to freedom of speech and is constitutionally protected against infringement by state officials. The Fourteenth Amendment to the Constitution protects these First Amendment rights from state infringement, Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and these First Amendment rights extend to school children and students insofar as unreasonable rules are concerned. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. Boards of education, presidents of colleges, and faculty advisers are not excepted from the rule that protects students against unreasonable rules and regulations. This Court recognizes that the establishment of an educational program requires certain rules and regulations necessary for maintaining an orderly program and operating the institution in a manner conducive to learning. However,

---

3. The complete text of the editorial, "A Lament for Dr. Rose," is as follows:

"Dr. Frank Rose, president of the University of Alabama, is currently under attack by certain state legislators for his refusal to censor a student publication. The publication, entitled, 'Emphasis 67, A World in Revolution,' served as the program for a series of guest speakers and panel discussions held on March 16 and 17 at the University. The publication contained brief biographical sketches of each of the participants, which included Secretary of State Dean Rusk, James Reston of the New York Times, and Professor Robert Scalapino, a leading authority on Asian politics.

"The theme of the 'Emphasis' program was a 'World in Revolution.' In keeping with this theme, the publication carried excerpts from the speeches of Bettina Aptheker, a Communist who gained notoriety at the University of California, and Stokely Carmichael, president of the Student Non-Violent Coordinating Committee, and the incendiary advocate of violent revolution and 'black power.'

"To give a balanced view of 'A World in Revolution,' the 'Emphasis' publication carried articles by leading anti-revolutionaries such as Gen. Earl G. Wheeler, chairman of the Joint Chiefs of Staff, and Roy Wilkins, president of the NAACP and a supporter of non-violent moderate change.

"Some of the legislators have read into this publication an attempt by President Rose to condone and abet revolutionary and subversive activity at the University.

"The Tropolitan feels that these legislators have sadly misinterpreted the intent of the publication.

"Surely, they cannot seriously consider Gen. Wheeler, the highest military official in the United States, a subversive. Surely, Secretary of State Dean Rusk, who was brought to the University as the keynote speaker on the 'Emphasis' program, and who is currently conducting a war of diplomacy and bullets against Communist subversion in Asia, cannot be labeled a subversive. The very purpose of including excerpted speeches by revolutionaries Carmichael and Aptheker was not to endorse their views, but to present a backdrop against which the phenomenon of revolution could be studied and the problems and the role of the United States in a world in revolution could be defined.

"The Tropolitan, therefore, laments the misinterpretation of the 'Emphasis' program by members of the legislature, and the considerable harassment they have caused Dr. Rose. It is our hope that this episode does not impair his effective leadership at the University or discourage him in his difficult task."

the school and school officials have always been bound by the requirement that the rules and regulations *must be reasonable.* Courts may only consider whether rules and regulations that are imposed by school authorities are a reasonable exercise of the power and discretion vested in those authorities. Regulations and rules which are necessary in maintaining order and discipline are always considered reasonable. In the case now before this Court, it is clear that the maintenance of order and discipline of the students attending Troy State College had nothing to do with the rule that was invoked against Dickey. As a matter of fact, the president of the institution, President Adams, testified that his general policy of not criticizing the Governor or the State Legislature under any circumstances, regardless of how reasonable or justified the criticism might be, was not for the purpose of maintaining order and discipline among the students. On this point, President Adams testified that the reason for the rule was that a newspaper could not criticize its owners, and in the case of a state institution the owners were to be considered as the Governor and the members of the Legislature.

With these basic constitutional principles in mind, the conclusion is compelled that the invocation of such a rule against Gary Clinton Dickey that resulted in his expulsion and/or suspension from Troy State College was unreasonable. A state cannot force a college student to forfeit his constitutionally protected right of freedom of expression as a condition to his attending a state-supported institution. State school officials cannot infringe on their students' right of free and unrestricted expression as guaranteed by the Constitution of the United States where the exercise of such right does not "materially and substantially interfere with requirements of appropriate discipline in the operation of the school." Burnside v. Byars, 363 F.2d 744 (5 Cir. 1966). The defendants in this case cannot punish Gary Clinton Dickey for his exercise of this constitutionally guaranteed right by cloaking his expulsion or suspension in the robe of "insubordination." The attempt to characterize Dickey's conduct, and the basis for their action in expelling him, as "insubordination" requiring rather severe disciplinary action, does not disguise the basic fact that Dickey was expelled from Troy State College for exercising his constitutionally guaranteed right of academic and/or political expression.

The argument by defendants' counsel that Dickey was attempting to take over the operation of the school newspaper ignores the fact that there was no legal obligation on the school authorities to permit Dickey to continue as one of its editors. As a matter of fact, there was no legal obligation on the school authorities to operate a school newspaper. However, since this state-supported institution did elect to operate The Tropolitan and did authorize Dickey to be one of its editors, they cannot as officials of the State of Alabama, without violating the First and Fourteenth Amendments to the Constitution of the United States, suspend or expel Dickey from this state-supported institution for his conduct as that conduct is reflected by the facts presented in this case.

As the Supreme Court stated in West Virginia State Board of Education v. Barnette, supra:

"The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."

Defendants' argument that Dickey's readmission will jeopardize the discipline in the institution is superficial and completely ignores the greater damage to college students that will result from the imposition of intellectual restraints such as the "Adams Rule" in this case. The imposition of such a restraint as here sought to be imposed upon Dickey and the other students at Troy State College violates the basic principles of academic and political expression as guaranteed by our Constitution. Dr. Rose recognized the importance of this academic and constitutional principle when he determined that as to the University of Alabama, such freedoms must be permitted to flourish. As the Supreme Court stated in Sweezy v. State of New Hampshire, 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957):

"We believe that there unquestionably was an invasion of petitioner's liberties in the areas of academic freedom and political expression—areas in which government should be extremely reticent to tread.

"The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."

In accordance with the foregoing, it is the order, judgment and decree of this Court that the action taken by Troy State College, acting through its Student Affairs Committee, on Friday, August 25, 1967, which action denies to Gary Clinton Dickey admission to Troy State College beginning with the fall quarter of 1967, be and the same is hereby declared unconstitutional, void, and is rescinded.

It is further ordered that the defendants immediately reinstate Gary Clinton Dickey as a student in Troy State College, commencing September 11, 1967.

It is further ordered that the defendants, and each of them, their agents, servants, employees, and others acting in concert or participation with them, be and each is hereby enjoined and restrained from denying, upon the basis of his conduct as herein discussed, Gary Clinton Dickey admission to Troy State College as a student and from refusing to allow him to attend as such for the academic year commencing September 11, 1967.

It is further ordered that the costs incurred in this proceeding be and they are hereby taxed against the defendants, for which execution may issue.