**Nathan ZUCKER, on behalf of Laura Zucker, an infant, and Jack Orentzel, on behalf of Richard Orentzel, an infant, and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**Adolph PANITZ, as Principal of New Rochelle High School; James K. Bishop, as President of the Board of Education of New Rochelle, and George C. Clark, as Superintendent of Schools of New Rochelle, Defendants.**

**No. 68 Civ. 1339.**

United States District Court
S. D. New York.
May 15, 1969.

Kramer & Labaton, New York City, and Alan H. Levine, of the New York Civil Liberties Union, for plaintiffs; Edward Labaton and Alan H. Levine, New York City, of counsel.

F. Harry Otto, New Rochelle, N. Y., for defendants; John I. Bosco, New Rochelle, N. Y., of counsel.

METZNER, District Judge:

This action concerns the right of high school students to publish a paid advertisement opposing the war in Vietnam in their school newspaper. The action is brought under 42 U.S.C. §§ 1981 and 1983 for declaratory judgment and injunctive relief prohibiting violation of plaintiffs' freedom of speech by the principal of New Rochelle High School, the president of the New Rochelle Board of Education, and the New Rochelle Superintendent of Schools.

Plaintiffs move in the alternative for judgment on the pleadings, summary judgment granting an injunction enjoining interference with the right of students in the high school to place advertisements in the school newspaper or otherwise to express their views on public issues, an injunction pendente lite restraining interference with publication of the proposed advertisement, or such other relief as the court deems proper.

A group of New Rochelle High School students, led by plaintiff Richard Oren-

tzel, formed an Ad Hoc Student Committee Against the War in Vietnam. The group sought to publish an advertisement in opposition to the war in the student newspaper, The Huguenot Herald, in November 1967, offering to pay the standard student rate. The text of the proposed advertisement is as follows: "The United States government is pursuing a policy in Viet Nam which is both repugnant to moral and international law and dangerous to the future of humanity. We can stop it. We must stop it." The editorial board of the newspaper, which was then headed by plaintiff Laura Zucker, approved publication of the advertisement, but the principal of the school, Dr. Adolph Panitz, directed that the advertisement not be published. The affidavit of plaintiff Orentzel alleges that the committee still desires to publish the advertisement and has been informed that the newspaper would accept it but for the directive of the principal.

The gravamen of the dispute concerns the function and content of the school newspaper. Plaintiffs allege that the purpose of the Huguenot Herald is *inter alia*, "to provide a forum for the dissemination of ideas and information by and to the students of New Rochelle High School." Therefore, prohibition of the advertisement constitutes a constitutionally proscribed abridgement of their freedom of speech.

The defendants take issue with this characterization of the newspaper. They advance the theory that the publication "is not a newspaper in the usual sense" but is a "beneficial educational device" developed as part of the curriculum and intended to inure primarily to the benefit of those who compile, edit and publish it.[1] They assert a long-standing policy of the school administration which limits news items and editorials to matters pertaining to the high school and its activities. Similarly, "no

advertising will be permitted which expresses a point of view on any subject not related to New Rochelle High School." Even paid advertising in support of student government nominees is prohibited and only purely commercial advertising is accepted. This policy is alleged to be reasonable and necessary to preserve the journal as an educational device and prevent it from becoming mainly an organ for the dissemination of news and views unrelated to the high school.

In sum, defendants' main factual argument is that the war is not a school-related activity, and therefore not qualified for news, editorial and advertising treatment. They have submitted issues of the newspaper from September 1968 to April 1969 to illustrate school-related subjects and the absence of other than purely commercial advertising.

If the Huguenot Herald's contents were truly as flaccid as the defendants' argument implies, it would indeed be a sterile publication. Furthermore, its function as an educational device surely could not be served if such were the content of the paper. However, it is clear that the newspaper is more than a mere activity time and place sheet. The factual core of defendants' argument falls with a perusal of the newspapers submitted to the court. They illustrate that the newspaper is being used as a communications media regarding controversial topics and that the teaching of journalism includes dissemination of such ideas. Such a school paper is truly an educational device.

For instance, on October 18, 1968, an article on draft board procedures, including discussion of the basis for graduate deferments as well as problems of initial registration appeared, as well as an article concerning a poll of high school students on national political candidates and the war. On January 31, 1969, the paper included an item that

---

1. Defendants' argument that the journal would be just as valuable an educational tool if it were compiled and then consigned to the files without publication is without merit, since in fact the paper is published and sold at 10 cents per copy or $2 per subscription. Moreover, the paper includes letters to the editor, clearly a part of the journalistic experience which would be truncated were the newspaper merely a dummy.

the principal had placed literature on the draft in the school library. On April 25, 1969, the paper reported on a draft information assembly and informed its readers of the availability of draft counseling outside the school. Moreover, items have appeared on the following: the grant of money by the students' General Organization to Eldridge Cleaver to speak at Iona College (vetoed by the principal); school fundraising activities for Biafra; federal aid for preschool through high school education; meeting of a YMCA-sponsored group whose purpose is discussion of such issues as racial change, violence and political action possibilities; a state assemblyman's proposal for an elected Board of Education; the proposal of several educators for community involvement as part of the educational process; types of narcotics and their effects; high school drug use; community treatment facilities; establishment of a new anti-Establishment high school newspaper; and a letter to the editor that a poll should be held to determine whether the newspaper should serve more than its present function and become an instrument and advocate of student power.

The presence of articles concerning the draft and student opinion of United States participation in the war shows that the war is considered to be a school-related subject. This being the case, there is no logical reason to permit news stories on the subject and preclude student advertising.

Defendants further argue that since no advertising on political matters is permitted, the plaintiffs have no cause for discontent. It is undisputed that no such advertising has been permitted, but this is not dispositive. In Wirta v. Alameda-Contra Costa Transit District, 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982 (1967) (en banc) (rehearing denied 1968), the court held that where motor coaches were a forum for commercial advertising, refusal to accept a proposed peace message violated the First Amendment guarantee of free speech.[2] It said:

"[D]efendants, having opened a forum for the expression of ideas by providing facilities for advertisements on its buses, cannot for reasons of administrative convenience decline to accept advertisements expressing opinions and beliefs within the ambit of First Amendment protection." Id. 64 Cal.Rptr. at 433, 434 P.2d at 985.

\* \* \* \* \* \*

"Not only does the district's policy prefer certain classes of protected ideas over others but it goes even further and affords total freedom of the forum to mercantile messages while banning the vast majority of opinions and beliefs extant which enjoy First Amendment protection because of their noncommercialism." Id., 64 Cal.Rptr. at 434, 434 P.2d at 986.

Cf. Danskin v. San Diego Unified School District, 28 Cal.2d 536, 171 P.2d 885 (1946).

Defendants would have the court find that the school's action is protected because plaintiffs have no right of access to the school newspaper. They argue that the recent Supreme Court case of Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (Feb. 24, 1969), held only that students have the same rights inside the schoolyard that they have as citizens. Therefore, since citizens as yet have no right of access to the private press, plaintiffs are entitled to no greater privilege.[3]

In *Tinker*, the plaintiffs were suspended from school for wearing black armbands to protest the war in Vietnam. The Court held that the wearing of armbands was closely akin to pure speech and that First Amendment rights, *"applied in light of the special characteris-*

---

2. See also Kissinger v. New York City Transit Authority, 274 F.Supp. 438 (S.D.N.Y.1967); Wolin v. Port of New York Authority, 268 F.Supp. 855 (S.D. N.Y.1967), aff'd, 392 F.2d 83 (2d Cir. 1968).

3. See generally Barron, Access to the Press—A New First Amendment Right, 80 Harv.L.Rev. 1641 (1967).

*tics of the school environment*, are available to teachers and students." Id. at 506, 89 S.Ct. at 736 (emphasis added). The principle of free speech is not confined to classroom discussion:

> "The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school. *It is also an important part of the educational process.* A student's rights therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interfer[ing] with the requirement of appropriate discipline in the operation of the school' and without colliding with the rights of others." Id. at 512, 89 S.Ct. at 739 (emphasis added).

Defendants have told the court that the Huguenot Herald is not a newspaper in the usual sense, but is part of the curriculum and an educational device. However, it is inconsistent for them to also espouse the position that the school's action is protected because there is no general right of access to the private press.[4]

We have found, from review of its contents, that within the context of the school and educational environment, it is a forum for the dissemination of ideas. Our problem then, as in *Tinker*, "lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities." Id. at 507, 89 S.Ct. at 737. Here, the school paper appears to have been open to free expression of ideas in the news and editorial columns as well as in letters to the editor. It is patently unfair in light of the free speech doctrine to close to the students the forum which they deem effective to present their ideas.[5] The rationale of *Tinker* carries beyond the facts in that case.

*Tinker* also disposes of defendants contention that cases involving advertising in public facilities are inapposite because a school and a school newspaper are not public facilities in the same sense as buses and terminals (see *Writa, Kissinger* and *Wolin*, cited herein)—that is, they invite only a portion of the public.

This lawsuit arises at a time when many in the educational community oppose the tactics of the young in securing a political voice. It would be both incongruous and dangerous for this court to hold that students who wish to express their views on matters intimately related to them, through traditionally accepted nondisruptive modes of communication, may be precluded from doing so by that same adult community.[6]

Plaintiffs' motion for summary judgment is granted. Settle order.

4. Different policy considerations govern whether a privately owned newspaper has an affirmative duty to grant access to its pages, and whether a school newspaper has such a duty. For instance, there would be involved the thorny issue of finding state action, a problem which does not exist regarding a school newspaper.

5. The argument that alternative modes of expression exist—for instance, conversations or armbands—thus permitting suppression of the chosen mode, is without merit and has been consistently disregarded by the courts. See, e. g., Tinker

v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (Feb. 24, 1969); Wirta v. Alameda-Contra Costa Transit District, 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982 (1967).

6. In *Tinker*, the Court noted that "the meeting at which the school principals decided to issue the contested regulation was called in response to a student's statement to the journalism teacher in one of the schools that he wanted to write an article on Vietnam and have it published in the school paper. (The student was dissuaded.)" 393 U.S. at 510, 89 S.Ct. at 738.