Robert A. KORN, Laurence Becker, Robert Hall, Richard M. Muirhead

v.

Dr. Wilson H. ELKINS, Individually and as President, University of Maryland, Dr. Walter B. Waetjen, Individually and as Vice-President for Administrative Affairs, University of Maryland, Clayton R. Plummer, Individually and as Director of Procurement, Purchasing Department, University of Maryland.

Civ. No. 70–47–N.

United States District Court, D. Maryland.

Sept. 17, 1970.

---

Neal D. Borden and John Henry Lewin, Jr., Baltimore, Md., for plaintiffs.

Francis B. Burch, Atty. Gen. of Maryland, and Estelle A. Fishbein, Asst. Atty. Gen. of Maryland, Baltimore, Md., for defendants.

Before WINTER, Circuit Judge, and NORTHROP and KAUFMAN, District Judges.

KAUFMAN, District Judge.

No person shall publicly mutilate, defile, defy, trample upon, or by word or act cast contempt upon any such flag, standard, color, ensign or shield [of the United States or of the State of Maryland].

Md. Ann. Code art. 27, § 83 (1967 Repl. Vol.). The definition of "flag, standard, color, ensign or shield" includes any "copy, picture or representation thereof." Md. Ann. Code art. 27, § 81 (1967 Repl. Vol.). Similar statutes have been enacted by the federal government, 18 U.S.C. § 700, and by each of the states. Prosser, Desecration of the American Flag, 3 Ind. Legal Forum 160, 198–99 n. 208 (1969).

Plaintiffs, undergraduate students attending the College Park campus of the University of Maryland, and officers or members of the Editorial Board of Argus, the University's student feature magazine, challenge herein the refusal of the University to permit the publication of an issue of Argus with a picture upon its cover of a burning American flag. Jurisdiction is founded upon 28 U.S.C. § 1343. This three-judge court was convened pursuant to 28 U.S.C. §§ 2281 and 2284 to consider plaintiffs' request for declaratory and injunctive relief based on plaintiffs' contention that the aforesaid Maryland statute is uncon-

stitutional.[1] Defendants, respectively the President, Vice-President for Administrative Affairs, and Director of Procurement of the University, have moved to dismiss the within action and have submitted in support of that motion an affidavit of the University's President, Dr. Elkins, categorically denying that there is any rule, regulation or custom of the University of Maryland prohibiting a student publication from containing a photograph or other depiction of a burning United States flag. Since the parties have stipulated in open court that there is no genuine issue as to any material fact, this Court will render summary judgment, pursuant to Rules 12(b) and 56 of the Federal Rules of Civil Procedure.

Publication of the magazine Argus is the responsibility of its student editors. Four issues of the magazine are published each year and distributed free of charge on the College Park campus of the University of Maryland. The magazine is financed from funds collected as "student activity fees," which each student attending the University of Maryland at College Park is required to pay, and also from the sale of commercial advertising which appears in the magazine. Funds collected as student activity fees are allocated to various student activities by the Student Government Administration of the University, and checks in payment of the activities are drawn by the University on those funds which are deposited in the custody of the Comptroller of the State of Maryland. The amount allocated to Argus for the 1969-70 school year was approximately $12,000. In October, 1969, plaintiffs met with a representative of the defendant Plummer, Director of Procurement, Purchasing Department of the University, to arrange for a printer for Argus. Bids were received and a contract for the printing was awarded to Guthrie Lithograph Company, Washington, D. C. In November, 1969, after the "paste-ups"

for the first 1969-70 issue of Argus were delivered to Guthrie Lithograph by the magazine editors, Guthrie refused to print the issue because it objected to the photographs on the cover and in the photograph feature section. Guthrie informed the University purchasing department that Guthrie believed that printing such material would subject it to criminal prosecution under the above-quoted Maryland statute.

The University purchasing department proceeded to procure another printer, McGregor & Werner, Inc. However, shortly thereafter, on December 5, 1969, defendant Plummer informed plaintiffs that the Attorney General of Maryland had advised Dr. Elkins that the publication of the cover would constitute a violation of the state statute prohibiting dessecration of the flag of the United States, and could subject "those persons responsible to the prescribed criminal penalty." The only part of the magazine submitted to the Attorney General was the cover. Plummer also called McGregor & Werner and effectively stopped the printing of the cover by indicating that the University would not pay for the work if the cover were printed. No board, committee, faculty member, or administrator of the University had ever, prior to the afore-related developments, censored Argus in any way. Not wishing to delay publication, plaintiffs then revised the cover. On or about December 17, 1969, the first 1969-70 issue of Argus appeared bearing the word "censored" across a plain white cover. No disciplinary action of any kind has been taken against any of plaintiffs by the University.

In Street v. New York, 394 U.S. 576, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969), the Supreme Court reversed a criminal conviction under a New York statute containing language almost identical with that in the Maryland statute involved herein. In Street, the defendant, upon hearing of the shooting of James Mere-

---

1. Plaintiffs, in their complaint herein, have also sought damages under 42 U.S.C. § 1983, but they have neither pressed, nor established any factual basis for, that claim. Consequently, that claim is hereby denied.

dith, the civil rights leader, burned an American flag on a street corner of New York City and made statements to the crowd which gathered, such as: "If they let that happen to Meredith, we don't need an American flag." (at 579, 89 S. Ct. at 1359). Mr. Justice Harlan, writing for the majority, stated that it was "unnecessary to consider" Street's contentions that the statute was facially unconstitutional since the statute had been "unconstitutionally applied * * * because it permitted him to be punished merely for speaking defiant or contemptuous words about the American flag" (at 581, 89 S.Ct. at 1360); that the record was "insufficient to eliminate the possibility either that [Street's] words were the sole basis of his conviction or that [Street] was convicted for both his words and his deed" (at 590, 89 S.Ct. at 1364); and that the record did not "constitutionally justify [Street's] conviction" (at 591, 89 S.Ct. 1354) under any of "four governmental interests which might conceivably have been furthered by punishing [Street] for his words" (at 591, 89 S.Ct. at 1365). Those four interests are:

* * * (1) vocally inciting others to commit unlawful acts; (2) an interest in preventing appellant from uttering words so inflammatory that they would provoke others to retaliate physically against him, thereby causing a breach of the peace; (3) an interest in protecting the sensibilities of passers-by who might be shocked by appellant's words about the American flag; and (4) an interest in assuring that appellant, regardless of the impact of his words upon others, showed proper respect for our national emblem. [at 591, 89 S.Ct. at 1365].

With regard to (1), Mr. Justice Harlan stated that Street's "words, taken alone, did not urge anyone to do anything unlawful." (at 591, 89 S.Ct. at 1365). With regard to (2), the Justice wrote that "we cannot say that [Street's] remarks were so inherently inflammatory to come within that small class of 'fighting words' which are 'likely to provoke the average

person to retaliation, and thereby cause a breach of the peace.' Chaplinsky v. New Hampshire, 315 U.S. 568, 574, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)." (at 592, 89 S.Ct. at 1365). With regard to (3), the majority opinion notes that "any shock effect of [Street's] speech must be attributed to the ideas expressed," and that:

* * * It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers. * * * [at 592, 89 S.Ct. at 1366].

With regard to (4), after citing and quoting from West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), Mr. Justice Harlan concluded (394 U.S. at 593, 89 S.Ct. at 1366):

We have no doubt that the constitutionally guaranteed "freedom to be intellectually * * * diverse and even contrary," and the "right to differ as to things that touch the heart of the existing order," encompass the freedom to express publicly one's opinions about our flag, including those opinions which are defiant or contemptuous. [quoting as from *Barnette* at 641–642, 63 S.Ct. at 1186–1187].

In People v. Radich, 26 N.Y.2d 114, 308 N.Y.S.2d 846, 257 N.E.2d 30 (Feb. 18, 1970), the Court of Appeals of New York, in a *five-to-two decision*, upheld the conviction, under the same statute at issue in *Street*, of a proprietor of a New York City art gallery at which were exhibited art works displaying the flag in sexual and other contexts which the majority characterized as "acts dishonoring the flag" (26 N.Y.2d p. 123, 308 N.Y.S.2d p. 853, 257 N.E.2d p. 35). In the dissent, Chief Judge Fuld, the author of the opinion upholding Street's conviction before the latter was reversed by the Supreme Court, concluded that no "sufficient legitimate public interest is served by preventing the sale and exhibition of the works of art" so as "to justify interference with [Radich's] right to free expression" (26 N.Y.2d at

p. 125, 308 N.Y.S.2d at p. 854, 257 N.E. 2d at p. 36); that nothing in the opinion of the Court of Appeals of New York in *Street* "suggests that the mere fact that a person chooses *to express himself by other than verbal means* removes him entirely from the protection of the First Amendment" (26 N.Y.2d at p. 127, 308 N.Y.S.2d at p. 855, 257 N.E.2d at p. 37, emphasis added); and that "the State may not legitimately punish that which would be constitutionally protected if spoken or drawn simply because the idea has been expressed, instead, through the medium of sculpture" (26 N.Y.2d at p. 127, 308 N.Y.S.2d at p. 856, 257 N.E.2d at p. 38).

In Cowgill v. California, 396 U.S. 371, 90 S.Ct. 613, 24 L.Ed.2d 590 (1970), in which the Supreme Court noted its denial of the appeal, Mr. Justice Harlan, joined by Mr. Justice Brennan, wrote:

> While I am of the view this appeal should be dismissed, I deem it appropriate to explain the basis for my conclusion since the issue tendered by appellant—whether symbolic expression by displaying a "mutilated" American flag is protected from punishment by the Fourteenth Amendment—is one that I cannot regard as insubstantial. See Street v. New York, 394 U.S. 576, 594, 89 S.Ct. 1354, 22 L.Ed.2d 572.

> The record before us is not in my judgment suitable for considering this broad question as it does not adequately flush the narrower and predicate issue of whether there is a recognizable communicative aspect to appellant's conduct which appears to have consisted merely of wearing a vest fashioned out of a cutup American flag. Such a question, not insubstantial of itself, has been pretermitted in the Court's previous so-called "symbolic speech" cases where the communicative content of the conduct was beyond dispute.

> * * * The Court has, as yet, not established a test for determining at what point conduct becomes so intertwined with expression that it becomes necessary to weigh the State's interest in proscribing conduct against the constitutionally protected interest in freedom of expression. [at 371–372, 90 S.Ct. at 614; citations omitted; footnote omitted].[2]

■■ In the case at bar, there were no acts other than the creation of the cover illustration and its attempted publication. Here, we are not faced with any intertwining of conduct and expression. Nor is there anything in the record in this case to suggest that any one or more of the "four governmental interests" set forth in *Street* have been offended. Here, we have only expression in the form of art. The teachings of *Street* clearly require the protection of the expression attempted herein. The Maryland statute cannot constitutionally be applied to curtail freedom of expression as such.

■ While the student press may not "enjoy the same privilege of nonmalicious misreporting afforded to critics of public figures under the *New York Times* decision[3] and its progeny," Developments in the Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1130 (1968), there must be a showing that suppression of the contents of a student magazine is necessary to preserve order and discipline before such suppression can constitutionally be permitted. *See* Dickey v. Alabama State Board of Education, 273 F.Supp. 613, 618 (M.D.Ala.1967). In the total absence of any such showing, we hold that the Maryland statute involved in this case was unconstitutionally applied when the University officials, upon the advice of Maryland's Attorney General, prohibited the use of the proposed cover. In so holding, we do not reach the ques-

---

2. See also the discussion of lower court opinions in *Street* and *Radich* in Note, Constitutional Law—Freedom of Speech—Desecration of National Symbols as Protected Political Expression, 66 Mich.L. Rev. 1040 (1968).

3. New York Times Co. v. Sullivan, 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686] (1964).

tion of whether that statute is or is not facially unconstitutional. *See Street, supra* 394 U.S. at 581, 89 S.Ct. 1354.[4]

■ The fact that the University is involved in the financing of Argus does not permit its officials to apply a statute unconstitutionally. In Antonelli v. Hammond, 308 F.Supp. 1329 (D.Mass. February 5, 1970), University officials claimed the right to censor contents, concededly not unconstitutionally obscene, in a student publication of a Massachusetts state college, the expenses of which publication were payable by the college from funds received from compulsory student-activity fees. Holding such censorship constitutionally impermissible, Judge Garrity wrote (at p. 1337):

> We are well beyond the belief that any manner of state regulation is permissible simply because it involves an activity which is a part of the university structure and is financed with

funds controlled by the administration. The state is not necessarily the unrestrained master of what it creates and fosters. Thus in cases concerning school-supported publications or the use of school facilities, the courts have refused to recognize as permissible any regulations infringing free speech when not shown to be necessarily related to the maintenance of order and discipline within the educational process. See, e.g., Dickey v. Alabama State Board of Education, 1967, M.D.Ala., 273 F.Supp. 613; Snyder v. Board of Trustees of University of Illinois, 1968, N.D.Ill., 286 F.Supp. 927; Brooks v. Auburn University, 1969, M.D.Ala., 296 F.Supp. 188; Zucker v. Panitz, 1969, S.D.N.Y., 299 F.Supp. 102; Smith v. University of Tennessee, 1969, E.D.Tenn., 300 F.Supp. 777; Close v. Lederle, 1969, D.Mass., 303 F.Supp. 1109.[5]

---

4. *But see* Hodson v. Buckson, 310 F.Supp. 528 (D.Del.1970), in which a three-judge court held the Delaware flag statute facially unconstitutional.

5. In *Dickey*, Chief Judge Johnson wrote (273 F.Supp. at 618):
   > * * * A state cannot force a college student to forfeit his constitutionally protected right of freedom of expression as a condition to his attending a state-supported institution. State school officials cannot infringe on their students' right of free and unrestricted expression as guaranteed by the Constitution of the United States where the exercise of such right does not "materially and substantially interfere with requirements of appropriate discipline in the operation of the school." Burnside v. Byars, 363 F.2d 744 (5 Cir. 1966). * * *

   *See also* Developments in the Law—Academic Freedom, 81 Harv.L.Rev. *supra* at 1129:
   > * * * The notion that the state can condition the grant of a privilege on the surrender of a constitutional right without compelling justification has been discredited by the Supreme Court in other areas, and by several lower federal courts in the context of student rights. With the removal of this obstacle to judicial relief, school regulations restricting student extra-

   curricular speech and association will be subjected to the requirements of the first amendment. [Citations omitted.]

   *See also* the following comments of Judge Garrity in Antonelli (308 F.Supp. at 1337):
   > These decisions do not stand for the proposition that a state college administration has no more control over the campus newspaper than it would have over a private publication disseminated on campus. In the very creation of an activity involving media of communication, the state regulates to some degree the form of expression fostered. But the creation of the form does not give birth also to the power to mold its substance. For example, it may be lawful in the interest of providing students with the opportunity to develop their own writing and journalistic skills, to restrict publication in a campus newspaper to articles written by students. Such a restriction might be reasonably related to the educational process. See generally, Developments in The Law—Academic Freedom, 1968, 81 Harv.L.Rev. 1045, 1128–1134. But to tell a student what thoughts he may communicate is another matter. Having fostered a campus newspaper, the state may not impose arbitrary restrictions on the matter to be communicated. See Zucker v. Panitz, *supra*. What was said in Tinker v. Des Moines In-

■ Nor does the fact that the University officials themselves, as persons at least to some extent involved in the printing, publication and/or distribution of Argus, may perhaps have been subject to prosecution, as was the exhibitor in *Radich,* permit them to apply the Maryland flag desecration statute unconstitutionally.

■ The within case poses a justiciable controversy which is not rendered moot by the fact that the issue in question of Argus has been published, since there is a continuing problem in connection with future issues of Argus, and whether those issues will be permitted by the University officials to contain contents identical or similar to the excised portions of the December, 1969 issue. Antonelli v. Hammond, 308 F.Supp. at 1334 *supra.* Further, this is not a case in which this Court should abstain at this time from exercising its jurisdiction until a Maryland court can have the opportunity to pass upon the constitutional question presented, since no state interpretation or construction of the Maryland flag desecration statute can eliminate the constitutional defect inherent in the application of the statute attempted in this case. *See* Anderson v. Solomon, 315 F.Supp. 1192, at p. 1195 (D. Md. August 11, 1970), and cases cited therein.

■ This Court hereby declares that the Maryland flag desecration statute cannot be applied by officials of the University of Maryland to prohibit future publication of issues of Argus containing contents of the type excised from the December, 1969 issue. Because this Court has no doubt that defendants, as responsible public officials, will abide by this opinion, this Court hereby declines to issue any injunction at this time. Antonelli v. Hammond, 308 F.Supp. at 1338 *supra;* Smith v. University of Tennessee, 300 F.Supp. 777, 783 (E.D.Tenn. 1969).

NORTHROP, District Judge (concurring in part and dissenting in part).

I agree with the majority that the action of the defendants as to this issue of *Argus* magazine was constitutionally impermissible, but I do so for a different reason. In this instance, well aware that the contents of the *Argus* magazine before us were just as questionable as the cover, the defendants nevertheless procured its publication, and such uneven application of prior restraint would seem to me to be constitutionally impermissible and a proper subject for declaratory relief. However, it is my feeling that if the censorship had gone to the contents as well as the cover of the publication, the university officials would have been exercising a constitutionally permissible prior restraint. I cannot subscribe to the view that the administration or the faculty must submit to possible criminal prosecution by the State in order to sustain the right of freedom of speech of a small minority of militant students. While a state university may not exercise censorship over the contents of a magazine merely by virtue of its proprietary interest, as was held in Dickey v. Alabama State Board of Education, 273 F.Supp. 613 (M.D.Ala.1967), and more recently

---

dependent Community School Dist., *supra* [393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731] where the form of expression was the wearing of black armbands, is equally applicable here. "In our system, students may not be regarded as closed-circuit recipients of only that which the state chooses to communicate. They may not be confined to the expression of those sentiments that are officially approved. In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." 393 U.S. 511, 89 S.Ct. 739.

Because of the potentially great social value of a free student voice in an age of student awareness and unrest, it would be inconsistent with basic assumptions of First Amendment freedoms to permit a campus newspaper to be simply a vehicle for ideas the state or the college administration deems appropriate. Power to prescribe classroom curricula in state universities may not be transferred to areas not designed to be part of the curriculum. [Footnote omitted.]

in Antonelli v. Hammond, 308 F.Supp. 1329 (D.Mass.1970), it does not make sense to say that in no instance, particularly when advised by their legal counsel (in this instance, the Attorney General), that they must permit students to force them to violate the law.

Here their proprietary interest could subject them, as persons responsible, to the prescribed criminal penalty, and they were so advised by the Attorney General with reference to the cover of *Argus*, which was the only part of that magazine submitted to the Attorney General. They were also advised by the first printer that his attorney had found not only the cover but the contents to be violative of the so-called uniform "flag desecration" statute. In People v. Radich, 26 N.Y.2d 114, 308 N.Y.S.2d 846, 257 N.E.2d 30 (Feb. 18, 1970), the proprietor of an art gallery exhibiting the works of an artist was found guilty of flag desecration. And a publisher, as well as the art director and editor of a magazine in People v. Von Rosen, 13 Ill.2d 68, 147 N.E.2d 327 (1958), were submitted to criminal prosecution, though their conviction was ultimately reversed for insufficiency of the evidence. Other cases that constituted desecration of the flag were Halter v. Nebraska, 205 U.S. 34, 27 S.Ct. 419, 51 L.Ed. 696 (1907), involving use of the flag on a beer bottle; State v. Schlueter, 127 N.J.L. 496, 23 A.2d 249 (1941), tearing and crumbling a flag before a group; and more recently, Hoffman v. United States, 256 A.2d 567 (D. C. Court of Appeals 1969), wearing a shirt resembling an American flag en route to a Congressional hearing. While the United States Supreme Court has held that one need not honor the flag of the United States, it has not yet held that it is permissible to desecrate it. In Street v. New York, 394 U.S. 576, 89 S. Ct. 1354, 22 L.Ed.2d 572 (1969), at least four Justices, former Chief Justice Warren, and Justices Black, White and Fortas, indicated that the uniform flag desecration statute, which is the statute in question here, is facially constitutional. Former Chief Justice Warren stated

categorically: "I believe that the States and the Federal Government do have the power to protect the flag from acts of desecration and disgrace." Id. at 605, 89 S.Ct. at 1372. Justice Fortas characterized the flag as "a special kind of personalty" and stated further: "(i)ts use is traditionally and universally subject to special rules and regulation" and when it is used for the purpose of protest, its use "does not immunize the violator." It is not every type of symbolic speech that is constitutionally protected. *See* United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). While freedom of expression is certainly the hallmark of academic freedom, with the university community one crucible in which ideas and possible solutions to our complex civilization can be ground out for the betterment of all mankind, freedom of expression cannot and should not be the instrument by which a small minority seeks to bring down our civilization.

The administration of the university has every right to reduce a point of friction in the interests of accomplishing educational ends. In *Tinker* and *Antonelli*, and the cases cited therein relating to freedom of speech on the campus, it is recognized that regulations restricting speech are permissible when they relate to the maintenance of order and discipline in the educational process. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1968). Recent events on campuses throughout the country clearly indicate that unrestrained protestations characterized as "symbolic speech" have escalated the "protestations" into violence and disrupted the vast majority of the students' pursuit of education. We judges often, in our charges to the jury, term the law as "common sense." Can it be said that it is common sense to force the university to walk the tight rope of "imminent danger" for the sake of rhetorically extending logic to its breaking point? Certainly recent events on the University of Maryland's campus do not warrant this

court in circumscribing the University in its sincere endeavor to eliminate "protestations" calculated to bring on disruption. The defendants are in a better position than this court to determine what printed matter, and under what circumstances that printed matter, might disrupt the order and discipline necessary to the educational process. I think the declaratory relief of the majority is over-broad, and I would not restrict the defendants from promulgating regulations of censorship and exercising them, even as to the uniform flag desecration statute.