450 F.2d 642
 146 U.S.App.D.C. 181
 BUSINESS EXECUTIVES' MOVE FOR VIETNAM PEACE, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Post-Newsweek Stations,
Capital Area, Inc., Intervenor.
DEMOCRATIC NATIONAL COMMITTEE, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, American Broadcasting
Companies, Inc. and Columbia
Broadcasting System, Inc., Intervenors.
 Nos. 24492, 24537.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 9, 1971.
Decided Aug. 3, 1971.
Petition for Rehearing Denied Oct. 4, 1971.
 
 Mr. Thomas R. Asher, Washington, D.C., with whom Messrs. Albert H. Kramer, Washington, D. C., and Michael Schneiderman, New York City, were on the brief, for petitioner in No. 24,492.
 Mr. Joseph A. Califano, Jr., Washington, D. C., with whom Messrs. David H. Lloyd and Irvin B. Nathan, Washington, D. C., were on the brief, for petitioner in No. 24,537.
 Mr. Daniel R. Ohlbaum, Deputy Gen. Counsel, Federal Communications Commission, for respondents.
 
 
 1
 Messrs. John H. Conlin, Associate Gen. Counsel, and Stuart F. Feldstein, Counsel, Federal Communications Commission, were on the brief for respondents in No. 24,492. Mr. John H. Conlin and Miss Katrina Renouf, Counsel, Federal Communications Commission, were on the brief for respondents in No. 24,537.
 
 
 2
 Mr. Henry Geller, Gen. Counsel, Federal Communications Commission, at the time the record was filed, also entered an appearance for respondent Federal Communications Commission in No. 24,492.
 
 
 3
 Mr. Howard E. Shapiro, Atty., Department of Justice, Washington, D. C., entered an appearance for respondent United States of America.
 
 
 4
 Mr. Ernest W. Jennes, Washington, D. C., with whom Messrs. Charles A. Miller and Henry Goldberg, Washington, D. C., were on the brief, for intervenor in No. 24,492.
 
 
 5
 Mr. J. Roger Wollenberg, Washington, D. C., with whom Messrs. Timothy B. Dyk and Daniel Marcus, Washington, D. C., were on the brief, for intervenor Columbia Broadcasting System, Inc. in No. 24,537.
 
 
 6
 Messrs. James A. McKenna, Jr. and Vernon L. Wilkinson, Washington, D. C., were on the brief for intervenor American Broadcasting Companies, Inc. in No. 24,537.
 
 
 7
 Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.
 
 J. SKELLY WRIGHT, Circuit Judge:
 
 8
 In these cases we are asked to decide whether a broadcast licensee may, as a general policy, refuse to sell any of its advertising time to groups or individuals wishing to speak out on controversial public issues. The Federal Communications Commission concluded that such a policy is permissible.[1] We reverse the Commission's decision. And we remand for further proceedings.
 
 
 9
 The principle at stake here is one of fundamental importance: it concerns the people's right to engage in and to hear vigorous public debate on the broadcast media. More specifically, it concerns the application of that right to the substantial portion of the broadcast day which is sold for advertising. For too long advertising has been considered a virtual free fire zone, largely ungoverned by regulatory guidelines. As a result, a cloying blandness and commercialism-sometimes said to be characteristic of radio and television as a whole-have found an especially effective outlet. We are convinced that the time has come for the Commission to cease abdicating responsibility over the uses of advertising time. Indeed, we are convinced that broadcast advertising has great potential for enlivening and enriching debate on public issues, rather than drugging it with an overdose of non-ideas and non-issues as is now the case.
 
 
 10
 Under attack here is an allegedly common practice in the broadcast industry-airing only those paid presentations which advertise products or which deal with "non-controversial" matters, and confining the discussion of controversial public issues to formats such as the news or documentaries which are tightly controlled and edited by the broadcaster. In the Commission's view, an attack on the permissibility of this practice "goes to the heart of the system of broadcasting which has developed in this country."[2] We disagree. The actual issue before us is relatively narrow and we decide it narrowly. We do not have to cut to the "heart" of our system of broadcasting; we leave undisturbed the licensee's basic right to exercise judgment and control in public issue programming and the sale of advertising time. All we do is forbid an extreme form of control which totally excludes controversial public debate from broadcast advertising time.
 
 
 11
 We hold specifically that a flat ban on paid public issue announcements is in violation of the First Amendment, at least when other sorts of paid announcements are accepted. We do not hold, however, that the planned announcements of the petitioners-or, for that matter, of any other particular applicant for air time-must necessarily be accepted by broadcast licensees. Rather, we confine ourselves to invalidating the flat ban alone, leaving it up to the licensees and the Commission to develop and administer reasonable procedures and regulations determining which and how many "editorial advertisements" will be put on the air.
 
 
 12
 * Both petitioners in these cases are organizations whose primary modus operandi is public persuasion and communication. As a rule, they do not attract attention to their views by performing newsworthy acts, such as engaging in civil disobedience or organizing mass demonstrations. They depend, instead, on their ability to get a hearing-as full as possible and as direct as possible-from the general public. Surely radio and television would seem to be the most effective media for their purposes. Yet they contend that their self-expression on those media-and, therefore, the public's access to their views-is significantly inhibited by broadcaster policies barring any and all paid editorial messages from the airwaves.
 
 
 13
 The Business Executives Move for Vietnam Peace (BEM) is a national organization of over 2,700 business owners and executives, organized in opposition to the war. BEM apparently believes that it is in a position to offer the public a unique viewpoint on what is no doubt one of the great political and moral issues of our time. In order to communicate that viewpoint, it prepared several recorded one-minute radio announcements. The announcements urged "immediate withdrawal of American forces from Vietnam and from other overseas military installations" and featured statements by leading businessmen and retired military officers whose views may carry particular weight with the general public. BEM sought to buy time to air these announcements on the broadcast media, just as commercial advertisers do. It must have seemed an extraordinarily effective means of directly communicating its ideas and sense of urgency to the broad listening audience.
 
 
 14
 In June 1969 BEM sought to purchase time for its announcements on WTOP, an all-news radio station in the nation's capital. Like most broadcasters, WTOP sells substantial amounts of time for short advertisements. Yet over a period of eight months it repeatedly refused to sell any time to the business executives. WTOP cited no particular objection to the planned announcements. Rather, it relied solely upon an across-the-board policy barring all editorial advertisements-"its long established policy of refusing to sell spot announcement time to individuals or groups to set forth views on controversial issues."[3] BEM then filed a complaint with the Federal Communications Commission alleging violations of both the fairness doctrine and the First Amendment.
 
 
 15
 The Democratic National Committee (DNC) came to the Commission with much the same sort of complaint. It stated that it was in the process of planning an extensive media campaign to communicate the Democratic Party's views on crucial issues and to solicit funds. In our political system, it is of obvious importance that the public have access-as direct and full as possible-to the views of the political parties. A party currently out of office may well regard such communication as particularly vital. Yet DNC alleged that it confronted several obstacles to direct self-expression on the broadcast media, among them the refusal of some broadcasters to sell time for comment on controversial public issues. Unlike the business executives, DNC did not complain of any individual refusal to sell time for a particular editorial advertisement. Rather, it cast the issue in a somewhat different light by seeking a declaratory ruling from the Commission that "[a] broadcaster may not, as a general policy, refuse to sell time to responsible entities, such as DNC, for the solicitation of funds and for comment on public issues."
 
 
 16
 The Commission considered the two cases together and rejected the arguments of both BEM and DNC on the same day. The issues involved did not overlap completely. For example, the Commission found a defect in the vagueness and generality of BEM's fairness doctrine complaint,[4] and it resolved DNC's contention concerning fund solicitation by noting that all three television networks had agreed to accept such solicitations and by stating that any broadcaster policy of confining solicitations to election periods alone "would appear arbitrary."[5] On the matters central to these petitions for review, however, the Commission resolved both cases in the same fashion, and we, therefore, are also considering them as one.
 
 
 17
 The Commission held that it is permissible for a broadcast licensee to follow a general policy of rejecting all editorial advertisements. The essence of its reasoning in the two cases was as follows: First, it interpreted the fairness doctrine to allow rejection of paid controversial announcements. The doctrine, evolved by the Commission and endorsed generally in the Communications Act, demands that all controversial issues of public importance be covered both fully and fairly by broadcasters. Yet the Commission held that it leaves the licensees broad leeway to exercise their professional judgment as to "the format for presentation of controversial issues 'and all other facets of such programming."' Editorial advertising, the Commission said, is simply one of several possible formats for coverage of public issues. Under the permissive "reasonableness" standard of the fairness doctrine, acceptance of that particular format is by no means compulsory.
 
 
 18
 Second, the Commission interpreted the First Amendment to be equally permissive. Its reasoning on this point was rather sparse. It made no effort, for example, to identify the peculiar First Amendment interests attaching to paid editorial announcements as opposed to coverage of controversial issues on news, interview or discussion programs. Instead, it was content to raise the spectre of the "chaos" and other practical difficulties that, it said, would attend a right of access to the broadcast media. The Commission concluded that the fairness doctrine's requirement of full and fair coverage-tolerant as it is of a flat ban on the editorial advertisement format of expression-provides as much protection of public debate as the First Amendment demands.
 
 
 19
 Before this court, both petitioners make substantially the same attack on the Commission's decision. They do not ask for a ruling that all editorial advertisements submitted to broadcasters must be accepted. Nor do they seek to foreclose entirely the broadcasters' exercise of reasonable discretion. What they advocate is a limited right of access to radio and television for paid public issue announcements. They attack the Commission's ruling that a total exclusion of such announcements is permissible.
 
 II
 
 20
 Petitioners have left no stone unturned in their attack on the exclusion of editorial advertising. They have invoked the Communications Act's "public interest" requirement[6] and the statutoryregulatory fairness requirement[7]-as well as First Amendment principles-to support their argument. In other contexts, we might attempt to avoid the constitutional issue by coming to a decision on nonconstitutional grounds. But that course is neither fruitful nor possible here.
 
 
 21
 Speaking specifically of the Commission, the Supreme Court has stressed the "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong." Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969). Thus the nonconstitutional question here is whether there are "compelling indications" that the public interest and fairness requirements compel some opening for public issue advertisements on radio and television. In matters of allocating burdens, reforming procedures and ensuring full attention to all relevant factors in agency decision making, we have not been reluctant to reverse the Commission in order to vindicate "the public interest."[8] We have also intervened to see that broad policies developed by the Commission under the fairness doctrine are applied fully and consistently to all cases.[9] However, when we are asked to reverse major substantive interpretations of the grand and open-ended statutory requirements, we tread somewhat more difficult terrain. Obviously, the requirements mean something and there must be a great range of actions which they foreclose to the Commission; but, in establishing the necessary guidelines, we must ourselves seek extrinsic guidance.
 
 
 22
 In these cases, that guidance comes from the Constitution. Petitioners have presented no "compelling" evidence from legislative history to indicate a congressional policy in favor of, or even a real congressional attention to, editorial advertising. Rather, their arguments on the nonconstitutional points closely parallel their constitutional arguments. The general policy considerations which they invoke encompass all of the interests that would have to be evaluated under the relevant First Amendment law. It would make no sense for us to blind ourselves to the constitutional status of those interests and to the doctrine that has been built up around them.
 
 
 23
 What then might be the "compelling indications" we are to consider? The ones which seem to us truly "compelling" involve First Amendment principles. Thus we conclude that the constitutional question must be faced and is, indeed, the essence of these cases. Whether our decision is styled as a "First Amendment decision" or as a decision interpreting the fairness and public interest requirements "in light of the First Amendment" matters little.
 
 III
 
 24
 It has always been clear that the broad-cast media-so vital to communication in our society-are affected by strong First Amendment interests.[10] Yet the nature of those interests has not been so clear; an evolution of constitutional principles in this area is still very much in progress. Until quite recently, the only interest raised to constitutional status was that of the broadcast licensees themselves. In a leading case, the Commission's powers over program content were attacked and upheld with reference solely to the licensees' right of immunity from governmental interference with their "speech." The scarcity of broadcast frequencies was said to justify some regulation trenching on the broadcasters' First Amendment interests. National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943). These cases mark a new effort by members of the public to assert their First Amendment interests in the operations of radio and television.
 
 
 25
 There is scant precedent for such an effort. Indeed, the few previous attempts by individuals or groups to enforce their First Amendment interests in court have failed. In each case, the litigants have run up against not only an unreceptiveness to their constitutional theory, but also a crabbed judicial view of "state action"-a view that the "[First] Amendment limits only the action of Congress or of agencies of the federal government and not private corporations such as [broadcast licensees]." Massachusetts Universalist Convention v. Hildreth & Rogers Co., 1 Cir., 183 F.2d 497, 501 (1950); McIntire v. Wm. Penn Broadcasting Co. of Philadelphia, 3 Cir., 151 F.2d 597, 601 (1945). See also Post v. Payton, E.D.N.Y., 323 F.Supp. 799 (1971).
 
 
 26
 We believe the path is now clear of such doctrinal impedimenta. Perhaps the most important recent development is the Supreme Court's seminal decision in Red Lion Broadcasting Co., supra. There the Court upheld another aspect of the Commission's regulation of program content-the fairness doctrine's personal attack and campaign editorial rules. However, the Court's opinion went well beyond the scarcity rationale of the National Broadcasting Co. case. It justified the Commission's interference with broadcasters' free speech by invoking specifically constitutional rights of the general public which, it said, underlie and support the fairness doctrine rules at issue. Issuing what must become a clarion call for a new public concern and activism regarding the broadcast media, the Court stated that "the people as a whole retain their * * * collective right to have the medium function consistently with the ends and purposes of the First Amendment."[11] It went on to say:
 
 
 27
 "* * * The right of free speech of a broadcaster * * * does not embrace a right to snuff out the free speech of others. * * *
 
 
 28
 ******
 
 
 29
 * * *
 
 
 30
 "* * * [A] licensee has no constitutional right * * * to monopolize a radio frequency to the exclusion of his fellow citizens. * * *
 
 
 31
 ******
 
 
 32
 * * *
 
 
 33
 "* * * It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount. * * *"[12]
 
 
 34
 Of course, the Red Lion Court had to invoke the public's First Amendment interests for a narrow purpose only-to uphold legislative and administrative action already taken. It did not have to reach the issue, presented in these cases, of invoking those interests for a direct attack on broadcasters' policies approved by the Commission. However, the language used by the Court is significantly expansive. It spoke of a First Amendment "right" held by "the people as a whole." A constitutional "right" is hardly deserving of the name if it can function only to permit legislative and administrative action and if its content depends entirely upon the current policies of the legislative and executive branches. The First Amendment, after all, contains nothing analogous to the fifth section of the Fourteenth Amendment, authorizing Congress to enforce constitutional interests unenforceable by the courts.[13]
 
 
 35
 For many purposes, it is proper to consider broadcast licensees as "private" businesses. Yet, for purposes of the First Amendment, "[o]wnership does not always mean absolute dominion." Marsh v. Alabama, 326 U.S. 501, 506, 66 S.Ct. 276, 90 L.Ed. 265 (1946). "Conduct that is formally 'private' may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373 (1966). The Red Lion Court itself commented on the impermissibility of "private censorship" and cited old doctrine that "'[f]reedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests."'[14] The reach of the First Amendment, therefore, depends not upon "public"-"private" technicalities, but upon more functional considerations. They are (1) the governmental involvement in or public character of a particular enterprise, and (2) the importance or suitability of that enterprise for the communication of ideas.[15]
 
 
 36
 The last few decades of court decisions expanding the concept of "state action" have focused on myriad indicia of governmental involvement and public character. Many of them are apparently applicable to the operations of the broadcast industry.[16] But we need stress only two more basic factors which, taken together, bring broadcast licensees well within the ambit of the First Amendment for the purposes of these cases. First, the general characteristics of the broadcast industry reveal an extraordinary relationship between the broadcasters and the federal government-a relationship which puts that industry in a class with few others.[17] It is one of "interdependence" and "joint participa[tion]." See Burton v. Wilmington Parking Authority, 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). "[T]he [federal] regulatory system," it has been said, "is as much responsible for the existence of a broadcasting medium as the Bureau of Engraving is responsible for the existence of United States currency."[18] It has long been recognized that the airwaves are "a limited and valuable part of the public domain,"[19] leased out temporarily by the federal government which retains ultimate control over them.[20] Federal agency review and guidance of broadcasters' conduct is automatic, continuing and pervasive.[21] For broadcast licensees are considered the "proxies" or "fiduciaries" of the people.[22] Almost no other private business-almost no other regulated private business-is so intimately bound to government and to service to the commonweal.
 
 
 37
 A second and even more important factor is the specific governmental involvement in the broadcasters' action now under review here. All of the cases in which previous courts have characterized broadcasters as mere "private corporations" immune from First Amendment constraints, see text at page 649, supra, have involved direct suits against broadcast licensees. In the cases before us now, however, the Commission has given its imprimatur to the flat ban on editorial advertising. It specifically considered and specifically authorized the flat ban. Thus we are called upon to review not simply a private decision, but a decision by a government agency, a decision which must inevitably provide guidance for future broadcaster action.
 
 
 38
 There is ample authority for the principle that specific governmental approval of or acquiescence in challenged action by a private organization indicates "state action."[23] Indeed, in a case similar to ours the Supreme Court held that a private bus company franchised by the federal government and regulated by the District of Columbia Public Utilities Commission could be subject to First Amendment constraints. It emphasized the specific regulatory acquiescence in the challenged action of the bus company:
 
 
 39
 "* * * In finding [state action] we do not rely on the mere fact that Capital Transit operates a public utility on the streets of the District of Columbia under authority of Congress. Nor do we rely upon the fact that, by reason of such federal authorization, Capital Transit now enjoys a substantial monopoly of street railway and bus transportation in the District of Columbia. We do, however, recognize that Capital Transit operates its service under the regulatory supervision of the Public Utilities Commission of the District of Columbia which is an agency authorized by Congress. We rely particularly upon the fact that that agency, pursuant to protests against the [challenged action], ordered an investigation of it and, after formal public hearings, ordered its investigation dismissed on the ground that the public safety, comfort and convenience were not impaired thereby. * * *"
 
 
 40
 Public Utilities Commission of District of Columbia v. Pollak, 343 U.S. 451, 462, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952). (Footnote omitted.)
 
 
 41
 Broadcasting's importance and suitability for communication of ideas need not be labored. Mere presence of large and appropriate audiences (and thus opportunities for effective communication) has sometimes been emphasized by the courts to show the relevance of First Amendment protections.[24] In Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968), for example, the Supreme Court held that a privately owned shopping center was an appropriate place for the "speech" of labor union picketers. It stressed "[t]he large-scale movement of this country's population from the cities to the suburbs [that] has been accompanied by the advent of the suburban shopping center * * *." Id. at 324, 88 S.Ct. at 1611. With this demographic change, the "speech" that once took place on the public streets around downtown shopping areas must be allowed to move to privately owned parking areas in the suburbs, for that is where the relevant audiences now are. The technological and cultural changes connected to the current preeminence of the broadcast media as our primary means of communication are no less striking. The soap box orator and the leafleter are becoming almost obsolescent; their Saturday afternoon audiences have increasingly moved indoors-in front of their television sets.[25]
 
 
 42
 Moreover, unlike most of the private entities held to be subject to First Amendment constraints, the broadcast media are specifically dedicated to communication. They function as both our foremost forum for public speech and our most important educator of an informed people. In a populous democracy, the only means of truly mass communication must play an absolutely crucial role in the processes of self-government and free expression, so central to the First Amendment That can be said of almost no other "private" enterprise.
 
 IV
 
 43
 Broadcast licensees, then, serve not only as "speakers" but also as administrators of a highly valuable communications resource, subject to First Amendment constraints. Their dual role demands that their own constitutional interests in free speech coexist with those of the general public. But what are the dimensions of the public's First Amendment interests in the operation of radio and television? And how do they apply to the issue of editorial advertising?
 
 
 44
 It is particularly important that these cases deal only with the public's First Amendment interests in broadcasters' allocation of advertising time. They deal only with time relinquished by broadcasters to others; petitioners argue only that, in relinquishing that time, broadcasters must not discriminate against protected expression. In normal programming time, closely controlled and edited by broadcasters, the constellation of constitutional interests would be substantially different. In news and documentary presentations, for example, the broadcasters' own interests in free speech are very, very strong.[26] The Commission's fairness doctrine properly leaves licensees broad leeway for professional judgment in that area. But in the allocation of advertising time, the broadcasters have no such strong First Amendment interests. Their speech is not at issue; rather, all that is at issue is their decision as to which other parties will be given an opportunity to speak.
 
 
 45
 Though the broadcasters themselves have no substantial First Amendment interest in the allocation of advertising time, we might expect that the interest of members of the public-potential advertisers-would be quite strong. However, the Commission and the broadcaster-intervenors have argued just the opposite. They contend that the public's constitutional concerns do not extend to advertising time. Thus we must decide whether the substantial block of the broadcast day devoted to advertising is but a vacuum, devoid of First Amendment constraints, in the midst of a medium powerfully affected by those constraints-a desert in the midst of an oasis.
 
 
 46
 The Commission and intervenors work from the following premise. They define the public's overall constitutional interests in the operations of radio and television quite narrowly. The public's only interest, they suggest, is as viewers and listeners-not as speakers. They cite to us the Red Lion Court's mention of "the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences" over the broadcast media.[27] And they read that statement to set forth not only an interest of the public, but the only interest of the public.
 
 
 47
 Working from that premise, the Commission and intervenors contend that the public already receives "suitable access" to controversial views on normal programming time. Application of the fairness doctrine's requirement of full and fair coverage of public issues in nonadvertising time, they suggest, ensures that all views on these issues will in fact be presented. They assume that editorial advertising adds nothing new to the debate. The fairness guarantee alone, they say, is enough to eliminate petitioners' claim on advertising time-and enough to satisfy the First Amendment. We disagree.
 
 
 48
 Surely the public's interest in free access to the full spectrum of ideas and controversial views on radio and television is highly important. The right to receive ideas and information is deeply rooted in First Amendment law.[28] The Red Lion Court stressed that right, since it was the one primarily relevant to the fairness doctrine rules at issue in the case. But we do not believe that the Red Lion decision makes the goal of an informed public the exclusive First Amendment interest constraining broadcasters. Certainly the Supreme Court has done so in no other context.
 
 
 49
 The public has a First Amendment interest in the mode or manner-as well as the content-of public debate aired on the broadcast media. The Red Lion Court itself stated specifically that "[i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas [in the broadcast media]."[29] This court, similarly, has said that the Commission is obliged to administer the airwaves "in such a manner that * * * debate on public issues is 'uninhibited, robust, and wideopen."' National Ass'n of Theatre Owners v. F.C.C., 136 U.S.App.D.C. 352, 365, 420 F.2d 194, 207 (1969). The reference to "unhibited" debate is, of course, borrowed from the Supreme Court's decision in New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). The Court there extended First Amendment protection to some forms of libel on public officials. It made clear that the Amendment's concern extends beyond the mere fostering of speech whose content will properly inform the public. The New York Times decision establishes a strong First Amendment interest in vigorous, "wideopen" public debate.
 
 
 50
 Furthermore, we must take note of a third-but, perhaps, most important-First Amendment interest. That is the interest of individuals and groups in effective self-expression. The Red Lion Court did say that "it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish."[30] For, as it pointed out, broadcast time is necessarily limited. But the limited nature of broadcast time does not dictate that the individual and group interest in self-expression be brushed aside entirely; it allows for a reasonably regulated, "abridgeable" right to speak. The First Amendment values of individual self-fulfillment through expression and individual participation in public debate have long been recognized.[31] We all have an interest in speaking up ourselves as well as in hearing others. It is too late to argue that the First Amendment protects ideas but not an individual's interest in expressing them and doing so in his own way.
 
 
 51
 We conclude, then, that the public's First Amendment interests constrain broadcasters not only to provide the full spectrum of viewpoints, but also to present them in an uninhibited, wide-open fashion and to provide opportunity for individual self-expression.[32] How do these three First Amendment interests relate to a more specific interest in the airing of editorial advertisements? The answer emerges when we understand the special importance of advertising time to our system of free expression. First, the initial decision to produce an editorial advertisement is in the hands of members of the public. The initiative to present a particular view does not have to come from a member of the broadcaster's staff. Second, a paid advertisement is basically controlled and edited by the advertiser. He is allowed to present his views in a fashion chosen by himself. If an individual is interviewed for a news program, he may expect his comments to be abbreviated and edited; reporters' commentary will qualify what he has to say. For it is the broadcasters' responsibility to be objective, to condense issues into available time for presentation, and to play up or play down views according to the broadcaster's opinion of what is important and interesting. But when an individual or group buys time to say its piece, the crucial controls are in its own hands. Editorial advertising is thus a special and separate mode of expression, not simply a duplication of other expression on the same medium.[33]
 
 
 52
 The importance of initiative and control to the First Amendment interests in wide-open debate and individual selfexpression should be obvious. Vigorous, free expression is promoted when members of the public have some opportunity to take the initiative and editorial control into their own hands on the broadcast media. It has traditionally been thought that the best judge of the importance of a particular viewpoint or issue is the individual or group holding the viewpoint and wishing to communicate it to others. In the First Amendment area, our best guarantee has always been a "free market" in which partisans who feel strongly on particular issues may decide on their own to speak out and to speak out in their own way. The present system, allowing a flat ban on editorial advertising, conforms instead to a paternalistic structure in which licensees and bureaucrats decide what issues are "important," how "fully" to cover them, and the format, time and style of the coverage.
 
 
 53
 Even if broadcasters were to succeed in presenting a full spectrum of viewpoints and partisan spokesmen on nonadvertising time, their retention of total initiative and editorial control is inimical to the First Amendment. The importance of fair, objective and full treatment of controversial issues on normal programming cannot be doubted. But, as the Supreme Court has said in the context of classroom debate, "supervised and ordained discussion" is not enough. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). "The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection."' Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). In other words, there is always a strong First Amendment interest in opening up channels for more spontaneous, selfinitiated, self-controlled expression.[34]
 
 
 54
 Even in terms of the public's First Amendment interest emphasized by the Commission and intervenors-the interest of "viewers and listeners" in passive access to the full spectrum of viewpoints on radio and television-editorial advertising plays an important role. The concept of "full" coverage of "controversial" issues "of public importance" is vague to say the least, and leaves much to the broadcasters' discretion (and possible oversight).[35] Assuming that broadcasters are sometimes fallible, the goal of a fully informed public is best attained by opening of outlets for members of the public to supplement the licensees' assessments of "importance," "controversiality" and "full" coverage. The Commission's and intervenors' argument might be somewhat stronger if it were designed to support a partial ban on editorial advertising concerning issues and views which have in fact been substantially aired on normal programming time.[36] The argument is unconvincing, however, in support of a flat, per se ban on any and all editorial advertisements.
 
 
 55
 Moreover, even if "antiwar views," for example, have in fact been presented on news and interview shows, it is not necessarily clear that a particular antiwar editorial advertisement would add nothing to the public's information and understanding. "Viewpoints" cannot be so neatly and infallibly catalogued as the Commission would have us believe. Selfexpression and public debate are much more subtle phenomena; matters of style and intensity of feeling are important components.[37] Again, an acrossthe-board ban on editorial advertisements-leaving the quality of public debate in the control of one licensee, supplemented by no other autonomous inputs-may well ignore opportunities to enliven and enrich the public's overall information.
 
 
 56
 We recognize, of course, that the onesidedness and private editing of particular "spot" editorial advertisements may in the end steer viewers and listeners away from the "truth" by distorting complex issues. Being brief, these "spot" messages-no less than normal broadcast news coverage-may not canvass all possible arguments or develop all possible implications of the position they espouse. But that does not mean that they are unprotected by the First Amendment. Our Constitution protects many forms of misleading and overly simplified political expression in order to ensure robust, wide-open debate. "[N]either factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct * *." New York Times Co. v. Sullivan, supra, 376 U.S. at 273, 84 S.Ct. at 722. Nor does the brevity of the criticism. We must, then, be very, very slow to judge any sort of speech on public issues worthless. The marketplace of ideas protected by the First Amendment, after all, is not governed by the tastes and intellectual standards of the universities or the broadcast newsroom-or even of judicial chambers.
 
 
 57
 We conclude, therefore, that the fairness doctrine's goal of full and fair coverage of issues on normal programming time does not eliminate the public's interest in a further, complementary airing of controversial views during advertising time. We must concur in the Supreme Court's only recorded comments on constitutional protection for editorial advertising-comments made in the context of newspapers, like broadcasting a medium which may be expected, if not required, to present the various sides of public issues in its non-advertising space. The Court said that editorial advertisements, unlike commercial advertisements,[38] are of fundamental First Amendment concern, since they deal with political questions. And it protected them from libel law attack to the same extent as the newspapers' own editorial columns, for
 
 
 58
 "[a]ny other conclusion * * * might shut off an important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities-who wish to exercise their freedom of speech even though they are not members of the press. * * * The effect would be to shackle the First Amendment in its attempt to secure 'the widest possible dissemination of information from diverse and antagonistic sources.' * * *"
 
 
 59
 New York Times Co. v. Sullivan, supra, 376 U.S. at 266, 84 S.Ct. at 718.
 
 V
 
 60
 We come now to the aspect of the broadcasters' policy which, petitioners say, trenches on the First Amendment interest in editorial advertising. The constitutional defect of that policy is somewhat ironic. The New York Times Court made clear that the fact distinguishing fully protected editorial advertising from less fully protected commercial advertising is that the former deals with controversial public issues. Indeed, the political nature of editorial advertising places it near the core of the First Amendment. However, the very characteristic which affords it strict constitutional protection is also the characteristic causing the broadcasters' challenged policy to single it out and exclude it from the airwaves. That, we believe, is the crucial aspect of these cases.
 
 
 61
 It is important to note that petitioners do not attack the exclusion of editorial advertising by broadcasters who accept no advertisements whatever.[39] We do not have to decide whether the broadcast medium inherently amounts to a "public forum" on the order of public streets or parks or meeting halls or even bus terminals.[40] We leave open the possibility that broadcasters may constitutionally relinquish no time at all for advertising of any sort. For the issue in these cases is the permissibility of discrimination, within a given block of advertising time, against "controversial" speech and in favor of commercial and "noncontroversial" speech. We deal here with a forum that already has been opened up by the licensees themselves, opened up for direct broadcast presentations by members of the public.
 
 
 62
 Fortunately, we do not write on a clean slate in this area. Six courts have confronted discriminations among types of speech like the one challenged here. Every one of them-four federal courts and two state supreme courts-has held that once a forum, subject to First Amendment constraints, has been opened up for commercial and "noncontroversial" advertising, a ban on "controversial" editorial advertising is unconstitutional unless clearly justified by a "clear and present danger." Lee v. Board of Regents of State Colleges, W.D.Wis., 306 F.Supp. 1097 (1969), affirmed, 7 Cir., 441 F.2d 1257 (1971); Zucker v. Panitz, S.D.N.Y., 299 F.Supp. 102 (1969); Kissinger v. New York City Transit Authority, S.D.N.Y., 274 F.Supp. 438 (1967); Hillside Community Church, Inc. v. City of Tacoma, 76 Wash. 2d 63, 455 P.2d 350 (1969); Wirta v. Alameda-Contra Costa Transit District, 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982 (1967). We join this unbroken line of authority.
 
 
 63
 First Amendment doctrine governing access to forums for communication has been elaborated often in recent years. The essential test is an exercise in balancing, though weighted in favor of First Amendment values.[41] On one hand, the court must assess the constitutionally protected interest in the particular expressive activity in the particular forum. On the other hand, it must assess the importance of other uses of the forum which may be threatened and the extent to which they actually will be disrupted. Access may be denied only if the disruption caused by a particular type of expression (e. g., public speaking, marching, picketing) clearly overrides the "preferred" interest in free speech. Thus there is some right of access by demonstrators to state capitol grounds[42] but not a jailyard.[43]
 
 
 64
 Ordinarily, courts have to make the basic balancing judgment on their own. However, when the administrator of a forum has determined to grant access to some speakers or some picketers, he has implicitly made that basic judgment himself. When some public speaking is allowed in a park, the park's administrator has determined that the normal and proper functions of the park will not be excessively harmed by public speaking. If he then attempts to deny access to other public speakers, he cannot be heard to claim the opposite. The burden is on him to show some very substantial factor distinguishing the disruption they would cause from that caused by the speaking or picketing already allowed.
 
 
 65
 The same principle applies to broadcasters who have opened their forum to commercial speech but would close it to controversial political speech. By opening up a forum for some paid presentations, independently edited and controlled by members of the public, the broadcasters have waived any argument that advertising is inherently disruptive of the proper function of their stations. The exclusion of only one sort of advertising-which we have shown to have great First Amendment value-is then highly suspect, a prima facie constitutional violation. To justify the exclusion, there must be a substantial factor distinguishing the disruptive effect of editorial advertising from that of commercial advertising.
 
 
 66
 The content of the idea which the excluded speakers seek to promote is-emphatically-not permitted as a distinguishing factor in itself. Indeed, the existence of an exclusionary discrimination apparently based on the content of ideas presents an additional, or greatly heightened, prima facie constitutional violation. Both free speech and equal protection principles condemn any discrimination among speakers which is based on what they intend to say.[44] If the First Amendment prohibits anything at all, it must be a censorial discrimination among ideas. And since First Amendment rights have been held to be "fundamental rights" triggering the strict standard of review under equal protection principles, Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), it is doubly clear that the burden of justifying any apparent discrimination is very great indeed.
 
 
 67
 At least 20 years ago, the Supreme Court began condemning discriminations among different exercises of the same type of expression. Fowler v. Rhode Island, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 823 (1953); Niemotko v. Maryland, 340 U.S. 268, 272-273, 71 S.Ct. 325, 95 L.Ed. 267 (1951). Both cases involved access to a forum already opened to others. More recently, the Court in Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), invalidated a state regulation that permitted labor picketing but not civil rights picketing. In his concurrence, Mr. Justice Black stated that this sort of discrimination is "censorship in a most odious form" and violates both the First Amendment and the equal protection clause. Id. at 581, 85 S.Ct. at 470. Similarly, in Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966), the Court upheld a ban on demonstrations in a jailyard, but was careful to note that "[t]here is not a shred of evidence in this record * * * [the demonstrators were excluded] because the sheriff objected to what was being sung or said by the demonstrators or because he disagreed with the objectives of their protest." Id. at 47, 87 S.Ct. at 247.
 
 
 68
 No doubt a discrimination against all controversial speech-such as we face in these cases-is somewhat less "odious" than a discrimination among different controversial viewpoints on particular issues. But it is a form of censorship just the same.[45] It is a favoritism toward the status quo and public apathy and, in these cases, a favoritism toward bland commercialism.[46] Such favoritism flies in the face of the First Amendment, whose central purpose is to protect and promote controversy, "uninhibited, robust and wide-open," on public issues.
 
 
 69
 Moreover, it is by no means clear that a broadcasters' ban on "controversial" advertising does not impermissibly open the door to a sub rosa discrimination among controversial ideas. The term "controversial" is extraordinarily vague. Some advertisements may not be deemed "controversial"-and may not even be "controversial" for purposes of the fairness doctrine[47]-but may still express ideas, the negative of which would surely be labeled "controversial."[48] Ads for Radio Free Europe or Army recruiting, for example, may be allowed unanswered on the air, while ads calling the notion of the "free world" a sham or ads calling the Army a threat to democracy would be banned entirely. The line between ideological and nonideological presentations is an almost impossible one to draw. All too often in our society one particular ideology-that of passivity, acceptance of things as they are, and exhaltation of commercial values-is simply taken for granted, assumed to be a nonideology, and allowed to choke out all the rest.[49]
 
 
 70
 Thus the editorial advertising ban, particularly when licensees accept advertising generally, establishes an unmistakable infringing of First Amendment liberties. The Commission and the broadcasters, then, bear a very heavy burden of justification. Whether we require a "compelling" justification, an "overriding" justification, or a "clear and present danger" is relatively unimportant.
 
 VI
 
 71
 It being established that there is a strong and specific First Amendment interest in editorial advertising and that the policies discriminatorily barring such expression work a prima facie violation of constitutional principles, we must consider the countervailing considerations raised by the Commission and the broadcaster-intervenors. In order to justify the policy at issue, they must show some very substantial harm that would be caused by acceptance of editorial advertising-a sort of harm great enough to override the First Amendment interests at stake and a sort of harm not already involved in the acceptance of commercial and "noncontroversial" advertising. Only such a showing could convince us that the ban on editorial advertisements is supported by sufficient countervailing values and is not based solely on the content of the ideas conveyed.
 
 
 72
 The Commission and intervenors have begun from the assumption that our holding for petitioners would deprive broadcast licensees of their highly prized editorial independence and control over their frequencies, giving editorial advertisers a right to air time which commercial advertisers do not presently have. They have argued that petitioners seek the right to "grab the mike" from broadcasters' hands.[50] The result, they say, would be a three-fold disaster. First, they foresee "'a return to the chaotic situation of radio's early days"'[51] when too many hands grabbing for too few mikes made successful broadcasting impossible. Second, they argue that compulsory acceptance of editorial advertising would allow a few rich individuals or groups to buy up great blocks of time to purvey views on only one side of important issues, thus grossly unbalancing the broadcast station's treatment of those issues. And third, they point out that broadcasters compelled to accept editorial advertisements on one side of an issue would then be required by the fairness doctrine to accept at least some advertisements on the other side-free of charge if necessary. Provision of such free advertising time, they say, would cut into the broadcasters' revenues and might bring financial collapse.
 
 
 73
 The arguments of the Commission and intervenors fall well short of the mark. The reason is that they have apparently misunderstood the narrowness of the issue here. All that we are considering is the permissibility of a total, flat ban on editorial advertising. All petitioners ask is that broadcasters be required to accept some editorial advertising. They do not advocate an absolute right to air their advertisements. As the Red Lion Court made clear, there could not be any such absolute right because advertising time, like all broadcast time, is severely limited. See text at page 655 supra. Under the Communications Act, broadcasters are not "common carriers" obliged to accept any advertising message that is submitted.[52] And petitioners do not argue that they should be. What petitioners do argue is that editorial advertisements should at least be considered and that some should be aired.
 
 
 74
 Such a modest reform would not substantially undermine broadcasters' editorial control over their frequencies. For broadcasters would retain full latitude to control the content of their programming. Their editorial control over non-advertising time would not be disturbed whatever. All that would be affected is their allocation of advertising time-an area in which editorial control over content has never been of major importance. The interest in deciding which advertisements to accept is not as great as in deciding what public issues to cover and how to cover them on news presentations, for example. See text at page 654 supra. It surely cannot be equated, as the Commission and intervenors suggest, with the interest of law review editors in deciding what articles to publish. See Avins v. Rutgers, State University of New Jersey, 3 Cir., 385 F.2d 151 (1967), cert. denied, 390 U.S. 920, 88 S.Ct. 855, 19 L.Ed.2d 982 (1968). A broadcaster traditionally is not nearly as involved in the preparation and editing of advertisements as a law review staff is in the preparation and editing of articles.
 
 
 75
 Within the affected block of advertising time, neither chaos nor anything approaching chaos would follow the modest reform at issue. For, again, broadcasters would retain wide-ranging control. It is well established in First Amendment law governing access to forums that "reasonable regulations" may be promulgated and enforced to limit the exercise of free speech.[53] At the least, there may be regulations determining the time, place and manner of speech. They may not be used to stifle speech, but they are absolutely necessary to see that too many groups speaking at once do not drown out one another or trench overly much on the normal uses to which the forum is put by the public in general. The same principle applies to broadcasters' methods for allocating advertising time. All that petitioners condemn here are regulations providing that public issue advertising may be aired "at no time, in no place and in no manner" over the broadcast media.
 
 
 76
 Clearly, for example, broadcasters are entitled to place an outside limit on the total amount of editorial advertising they will sell. To fail to impose some such limit would be to deny the public the other sorts of programming which it legitimately expects on radio and television. Similarly, "reasonable regulation" of the placement of advertisements is altogether proper. No advertiser has a right to air his presentation at any particular point in an evening's programming. Nor does he have a right to clog a particular time segment with his messages. A relegation of all editorial advertising to non-"prime time" or any other major discrimination in the placement of editorial advertisements would no doubt go too far. But there is still room for broad exercise of the broadcasters' discretion.
 
 
 77
 We need not define the precise control which broadcasters may exercise over editorial advertising. Rather, the point is that by requiring that some such advertising be accepted, we leave the Commission and licensees broad latitude to develop "reasonable regulations" which will avoid any possibility of chaos and confusion. The spectre of chaos and "mike grabbing" raised by the Commission and intervenors here is, as petitioners say, a "bogus issue." Broadcasters, after all, have dealt quite successfully with the scheduling problems involved with commercial advertising. We require only that noncommercial advertisers be treated in the same evenhanded way. Although many broadcasters already do allow editorial advertisements on the air, we have not been shown one reason, drawn from their experience, to suggest that chaos has resulted.
 
 
 78
 Beyond the mistaken suggestion of administrative apocalypse, the Commission and intervenors have raised a more plausible and important claim, involving the danger that a few individuals or groups might come to dominate editorial advertising time. Of course, the mere fact that wealthy people may use their opportunities to speak more effectively than other people is not enough to justify eliminating those opportunities entirely. It takes more money to operate a magazine or newspaper-or, for that matter, a broadcast station-than to buy a segment of time for an editorial advertisement. Yet we are not reluctant to provide strict First Amendment protection for the operators of magazines, newspapers and broadcast stations. The real problem, then, is not that editorial advertising will cost money, but that it may be dominated by only one group from one part of the political spectrum. A onesided flood of editorial advertisements could hardly be called the "robust, wide-open" debate which the people have a right to expect on radio and television.
 
 
 79
 Again, however, invalidation of a flat ban on editorial advertising does not close the door to "reasonable regulations" designed to prevent domination by a few groups or a few viewpoints. Within a general regime of accepting some editorial advertisements, there is room for the Commission and licensees to develop such guidelines.[54] For example, there could be some outside limits on the amount of advertising time that will be sold to one group or to representatives of one particular narrow viewpoint. The licensee should not begin to exercise the same "authoritative selection" in editorial advertising which he exercises in normal programming. See text at pages 656 supra. However, we are confident of the Commission's ability to set down guidelines which avoid that danger.
 
 
 80
 We are no less confident of its ability to deal reasonably with the final problem it has raised-that relating to licensees' fairness obligations. Invalidation of a flat ban on editorial advertising, of course, leaves the Commission the power to require that if editorial advertisements are accepted on one side of an issue, then broadcasters must also accept at least some advertisements on the other side of the issue, free of charge if necessary. See Cullman Broadcasting Co., 40 F.C.C. 576 (1963). The result of such a reasonable regulation, however, need not be financial disaster. Indeed, it is incredible that the Commission would enforce a rule so rigid that licensees would be driven out of business.[55] If the obligation to provide some free time for answering editorial advertisements were shown to threaten actual financial harm to particular broadcasters, the Commission could make necessary adjustments.[56]
 
 
 81
 We conclude that none of the spectres raised by the Commission and intervenors spectres of chaos, grossly unbalanced programming and financial disaster-is enough to justify a flat ban on editorial advertising. What real problems there are may be dealt with while the acceptance of some editorial advertisements is required. The keynote must be a scheme of reasonable regulation, administered by the licensee and guided by the Commission. At least in the past, the Commission has not considered this task so impossible. Twenty-five years ago it decided a case in which a union charged that a broadcaster was violating free speech rights by refusing to sell program time for the airing of controversial views. The Commission stated:
 
 
 82
 "* * * The spirit of the Communications Act of 1934 requires radio to be an instrument of free speech, subject only to general statutory provisions imposing upon the licensee the responsibility of operating its station in the public interest. * * *
 
 
 83
 "* * * No single or exact rule of thumb for providing time, on a non-discriminatory basis, can be stated for application to all situations which may arise in the operation of all stations. The Commission, however, is of the opinion that the operation of any station under the extreme principles that no time shall be sold for the discussion of controversial public issues and that only charitable organizations and certain commercial interests may solicit memberships is inconsistent with the concept of public interest * * *. The Commission recognizes that good program balance may not permit the sale or donation of time to all who may seek it for such purposes and that difficult problems calling for careful judgment on the part of station management may be involved in deciding among applicants for time when all cannot be accommodated. However, competent management should be able to meet such problems in the public interest and with fairness to all concerned. The fact that it placed an arduous task on management should not be made a reason for evading the issue by a strict rule against the sale of time for any programs of the type mentioned."
 
 
 84
 United Broadcasting Co., 10 F.C.C. 515, 517-518 (1945). We agree with those views, and see no reason why the Commission and broadcast licensees should be any less competent in 1971 than they were in 1945. Given a scheme of reasonable regulation, there is no reason why acceptance of editorial advertising should cause any substantial harm or disruption not already involved in the acceptance of other advertising. Therefore, to single out and exclude editorial advertising is to violate the First Amendment of the Constitution.
 
 VII
 
 85
 On the basis of the foregoing, we reverse the Commission's decision that a flat ban on all editorial advertising is permissible. However, we remand these cases to the Commission for further consideration. On remand, the Commission should develop reasonable regulatory guidelines to deal with editorial advertisements. Petitioners should be allowed to reapply for advertising time; and, unless their presentations are found to be excludable under the Commission's guidelines, their applications should be accepted. Since the issues on which BEM and DNC seek to speak are current and changing, it is essential that regulations be developed speedily and that the affected broadcasters pass promptly upon petitioners' applications to buy time.
 
 
 86
 In the end, it may unsettle some of us to see an antiwar message or a political party message in the accustomed place of a soap or beer commercial. But we must not equate what is habitual with what is right-or what is constitutional. A society already so saturated with commercialism can well afford another outlet for speech on public issues. All that we may lose is some of our apathy. That is a small price to pay. For, as the Supreme Court has said, "a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949).
 
 
 87
 Reversed and remanded.
 
 McGOWAN, Circuit Judge (dissenting):
 
 88
 The majority does not hold that petitioner in No. 24,492 is entitled to have its proposed spot announcements carried by the intervenor-licensee there involved, or that the petitioner in No. 24,537 is assured of being able to buy time for its programs on public issues. What is held is that the Constitution commands that "some", but not all, editorial advertising be accepted; and the Commission is directed to embark upon rulemaking to determine how a licensee is to differentiate the "some" from the all.
 
 
 89
 The majority appears to believe that this assignment will not prove difficult. I am not so sure, particularly when I note that the only Commissioner who has perceived the same constitutional requirement as the majority responds to the practical problems by suggesting that sales of a significant proportion of the total broadcast time be made on a firstcome, first-served basis, accompanied by a possible suspension of the fairness doctrine. That approach does not seem to me a promising one in terms of the public's right to know.
 
 
 90
 The difficulties derive, of course, from the physical peculiarity which distinguishes radio and television communication from all other forms, namely, the limited number of frequencies and the impossibility of accommodating all who may wish to be heard over them. This, so the Supreme Court has said in Red Lion, makes it "idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of each individual to speak, write, or publish." The majority, in recognition of this fact, does not purport to discern other than an "abridgeable" or "lited" First Amendment right to initiate paid editorial advertising. Petitioners themselves, it is said, may conceivably never be able to insist that their particular advertising be accepted. That will depend upon the rules which the Commission propounds.
 
 
 91
 The Commission has, at the least, been set a task of heroic proportions, and one whose very complexities may undermine the premise upon which it is founded. The question is whether the Constitution requires that it be undertaken. I am not convinced that it does. It is presently the obligation of a licensee to advance the public's right to know by devoting a substantial amount of time to the presentation of controversial views on issues of public importance, striking a balance which is always subject to redress by reference to the fairness doctrine. Failure to do so puts continuation of the license at risk-a sanction of tremendous potency, and one which the Commission is under increasing pressure to employ.
 
 
 92
 This is the system which Congress has, wisely or not, provided as the alternative to public ownership and operation of radio and television communications facilities. This approach has never been thought to be other than within the permissible limits of constitutional choice. Its existence provides a mechanism for implementation of the public's right to know which, by and large, has been effective. Indeed, the loudest voices in criticism of it complain that it has been working to well for the comfort of governmental policy makers in the areas of greatest current concern.
 
 
 93
 It is hardly the path of wisdom to scrap it for a system in which money alone determines what issues are to be aired, and in what format, even assuming, as is likely to be the case, that those issues, whatever they may prove to be, compare favorably with the intellectual content of the great bulk of commercial advertising. The responsibility for informing the public is now squarely on the licensee. That responsibility will only be diluted and obscured by requiring the licensee, against his own better judgment, to accept paid editorial advertising. I do not think the First Amendment requires that result, at least not within the context of a regulatory scheme which has made provision for the airing of controversial issues of public importance.
 
 
 94
 Of course it is true that licensees are currently free to accept paid editorial advertising, and some do, subject always to the limitations of the fairness doctrine. It may well be that a detailed inquiry and investigation by the Commission of this area, by formal rulemaking or otherwise, would be both useful and consonant with the Commission's continuing obligation to see to it that the public interest obligations of the licensees are being met in the most effective way. The Commission's currently announced purpose to undertake a comprehensive and wideranging review of the operation of the fairness doctrine might well include the subject of paid editorial advertising. But, believing as I do that the First Amendment exerts no compulsion to the contrary, I would not order the Commission to undertake that review in a constitutional strait jacket which dictates the result in advance.
 
 
 
 [1]
 Business Executives Move for Vietnam Peace, 25 F.C.C.2d 242 (1970); Democratic National Committee, 25 F.C.C.2d 216 (1970)
 
 
 [2]
 Democratic National Committee, supra Note 1, 25 F.C.C.2d at 221
 
 
 [3]
 WTOP also stated "that 'subjects of this type require a more in-depth analysis than can be provided in a 10, 20, 30 or 60 second announcement."' Business Executives Move for Vietnam Peace, supra Note 1, 25 F.C.C.2d at 242. There is no indication, however, that WTOP's "long established policy" of refusing to sell time for any controversial advertisement would have permitted it to sell BEM 5 minutes or 10 minutes for a more "in-depth" treatment of its antiwar views. For a discussion of the permissibility of a flat ban on "short" public issue advertisements, see text at page 658 infra
 
 
 [4]
 In its original complaint, BEM alleged generally that WTOP had failed to cover antiwar views fully and fairly. However, it offered no specific proof whatever of its allegations, and WTOP, on the other hand, offered a lengthy compilation of news and interview shows which aired the opinions of some antiwar groups and individuals. BEM has not pressed its fairness doctrine argument on appeal, but rather has relied solely upon the First Amendment right-of-access contention which it also made before the Commission. Therefore, we need not consider here the Commission's holding that BEM failed to shoulder its full burden of going forward under the fairness doctrine
 
 
 [5]
 All three television networks also commented on the sale of time for editorial advertising. CBS stated it would sell no time for such advertising, although an exception would be made for broadcasts on behalf of political candidates or ballot propositions. ABC said it would not sell time to most groups for public issue advertising since that would inspire a "flood" of requests, but it would "be prepared, consistent with its other obligations, to accept such orders for time from major political parties as can be accommodated on a reasonable basis." And NBC stated it "has no policy which would prevent the purchase of program time envisioned by DNC." We are constrained to note here that any discrimination in the sale of editorial advertising time in favor of political parties alone or the "major" political parties-and totally excluding other more issue-oriented groups or "minor" political parties-would be highly suspect under the First Amendment. See text at pages 660-661 infra
 
 
 [6]
 47 U.S.C. Secs. 307(d), 309(a) (1964)
 
 
 [7]
 47 U.S.C. Sec. 315(a) (1964). For a discussion of the regulatory development of the fairness doctrine and its eventual adoption in the Communications Act, see Red Lion Broadcasting Co. v. F.C.C., 395 U.S. 367, 375-381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)
 
 
 [8]
 See, e. g., Office of Communication of United Church of Christ v. F.C.C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966); 138 U.S.App.D.C. 112, 425 F.2d 543 (1969)
 
 
 [9]
 See, e. g., Retail Store Employees Union, Local 880 v. F.C.C., 141 U.S.App.D.C. 94, 436 F.2d 248 (1970)
 
 
 [10]
 See, e. g., United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Congress itself has prohibited any interference by the Commission with "the right of free speech by means of radio communication." 47 U.S.C. Sec. 326 (1964)
 
 
 [11]
 395 U.S. at 390, 89 S.Ct. at 1806
 
 
 [12]
 Id. at 387, 389, 390, 89 S.Ct. at 1805, 1806
 
 
 [13]
 On the effect of the specific language in the fifth section of the Fourteenth Amendment, see Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970); Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Of course, the Fourteenth Amendment does not apply to federal regulation of the broadcast industry, since no interference with the states is involved
 
 
 [14]
 395 U.S. at 392, 89 S.Ct. at 1808, quoting Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945)
 
 
 [15]
 Most "state action" cases, of course, have been concerned with equal protection rights under the Fourteenth Amendment rather than with free speech rights under the First Amendment. However, the principle of governmental involvement developed therein has been applied equally well in the First Amendment context. See, e. g., Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); Farmer v. Moses, S.D.N.Y., 232 F.Supp. 154 (1964). The principle of "public character" may be found in decisions dealing directly with application of First Amendment rights to "private" entities. See, e. g., Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Tanner v. Lloyd Corp., D. Ore., 308 F.Supp. 128 (1970); Diamond v. Bland, 3 Cal.3d 653, 91 Cal.Rptr. 501, 477 P.2d 733 (1970). The importance and suitability of a particular place for the communication of ideas has been stressed in all of the cases cited above, as well as in all of the access-to-publicforum cases, see Notes 40-43 infra
 
 
 [16]
 Dissenting in the BEM case now under review, Commissioner Johnson dealt exhaustively with the Supreme Court's state action doctrine, isolating eight separate indicia of "state action." He argued very strongly that all eight indicia apply to broadcast licensees. Business Executives Move for Vietnam Peace, supra Note 1, 25 F.C.C.2d at 253-264. Because this highly analytical-one might say mechanical-approach runs the risk of reading Supreme Court opinions for more than they mean, we have chosen to paint with a broader brush. Ours is the approach which the Supreme Court seems in fact to have used in the past
 
 
 [17]
 In particular, broadcasting may be easily distinguished from the newspaper industry in terms of "state action." In two recent decisions, courts have held that newspapers are not subject to the First Amendment. Associates & Aldrich Co., Inc. v. Times Mirror Co., 9 Cir., 440 F.2d 133 (1971); Chicago Joint Board Amalgamated Clothing Workers of America, AFL-CIO v. Chicago Tribune Co., 7 Cir., 435 F.2d 470 (1970). While the governmental involvement in and public character of newspapers is surely less than that of broadcasting, we of course need express neither agreement nor disagreement with the cited decisions here
 
 
 [18]
 Pemberton, The Right of Access to Mass Media, in N. Dorsen (ed.), The Rights of Americans 277, 290 (1971). The Government is also directly responsible for the very existence of particular broadcasters. "[E]xisting broadcasters have often attained their present position because of their initial government selection in competition with others * * *. * * * [Their present] advantages are the fruit of a preferred position conferred by the Government." Red Lion Broadcasting Co. v. F.C.C., supra Note 7, 395 U.S. at 400, 89 S.Ct. at 1812
 
 
 [19]
 Office of Communication of United Church of Christ v. F.C.C., supra Note 8, 123 U.S.App.D.C. at 337, 359 F.2d at 1003
 
 
 [20]
 The licensing-out or delegation of governmental authority has been an element in some of the Supreme Court's most expansive state action decisions. See Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944). The mere existence of a licensing or delegation relationship is not, of course, enough by itself to establish state action; licensed pharmacists cannot be equated with licensed broadcasters. The actual extent of governmental involvement and the public character of the enterprise in question remain the final tests of state action
 
 
 [21]
 The activities of a governmental regulatory agency have also been emphasized in at least one of the Supreme Court's expansive state action decisions. See Public Utilities Comm'n of District of Columbia v. Pollak, supra Note 15, 343 U.S. at 462, 72 S.Ct. at 820, citing American Communications Ass'n v. Douds, 339 U.S. 382, 401, 70 S.Ct. 674, 94 L.Ed. 925 (1950). ("[W]hen authority derives in part from Government's thumb on the scales, the exercise of that power by private persons becomes closely akin, in some respects, to its exercise by Government itself.")
 
 
 [22]
 See Red Lion Broadcasting Co. v. F.C.C., supra Note 7, 395 U.S. at 394, 396, 89 S.Ct. 1794, 23 L.Ed.2d 371; Office of Communication of United Church of Christ v. F.C.C., supra Note 8, 123 U.S.App.D.C. at 337, 359 F.2d at 1003
 
 
 [23]
 The Supreme Court has said that "action of state courts and judicial officers in their official capacities is to be regarded as action of the State * * *." Shelley v. Kraemer, 334 U.S. 1, 14, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). See New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); Van Alstyne, Mr. Justice Black, Constitutional Review, and the Talisman of State Action, 1965 Duke L.J. 219, 227-230. See also this court's discussion of the Shelley principle-which surely must apply to actions of a federal administrative agency specfically approving private action-in Edwards v. Habib, 130 U.S.App.D.C. 126, 397 F.2d 687 (1968). Specific governmental acquiescence, as well as specific approval, has also been a focus of Supreme Court state action decisions. See Marsh v. Alabama, supra Note 15, 326 U.S. at 507 & n. 4, 509, 66 S.Ct. 276; Burton v. Wilmington Parking Authority, supra Note 20, 365 U.S. at 725, 81 S.Ct. 856
 
 
 [24]
 See, e. g., Wolin v. Port of New York Authority, 2 Cir., 392 F.2d 83, 90-91 (1968) ("The propriety of a place for use as a public forum * * * [may be established if] the place is where the relevant audience may be found."). Of course, the cases before us involve the right to speak on a medium of communication, not in a particular place. Thus many of the considerations are different; but the basic concern with the ability to reach the relevant audience applies in both situations
 
 
 [25]
 The Supreme Court has noted that broadcast "technology * * * supplants atomized, relatively informal communication with mass media as a prime source of national cohesion and news * * *." Red Lion Broadcasting Co. v. F.C.C., supra Note 7, 395 U.S. at 386 n. 15, 89 S.Ct. at 1805
 
 
 [26]
 See id. at 396, 89 S.Ct. 1794
 
 
 [27]
 Id. at 390, 89 S.Ct. at 1807
 
 
 [28]
 See Stanley v. Georgia, 394 U.S. 557, 564, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); Lamont v. Postmaster General, 381 U.S. 301, 307-308, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965) (Mr. Justice Brennan, concurring); Martin v. City of Struthers, 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). The "right to receive," however, has not been considered the central First Amendment interest, and never the only First Amendment interest
 
 
 [29]
 395 U.S. at 390, 89 S.Ct. at 1806. (Emphasis added)
 
 
 [30]
 Id. at 388, 89 S.Ct. at 1806
 
 
 [31]
 See, e. g., T. Emerson, Toward a General Theory of the First Amendment 4-7 (Vintage ed. 1967)
 
 
 [32]
 Of course, all three of these interests apply to non-advertising time as well as to advertising time. The Commission, in fact, has encouraged broadcasters to present conflicting views through partisan voices as well as through predigested commentary. See Democratic National Committee, supra Note 1, 25 F.C.C.2d at 222-223. However, as we make clear in text, the selective, edited presentation by the Government's licensee of partisan voices on news shows, for example, does not erase the special advantages of allowing self-selected partisan voices on advertising time
 
 
 [33]
 See text at pages 657-658 & Note 37 infra. See also Note, A Fair Break for Controversial Speakers: Limitations of the Fairness Doctrine and the Need for Individual Access, 39 Geo.Wash.L.Rev. 532, 557-560 (1971)
 
 
 [34]
 We are cognizant of current proposals to reform the Commission's fairness doctrine and invigorate its enforcement, so lackluster in the past. We commend the Commission's consideration of new rules to "encourage and implement" presentation of opposing viewpoints by reemphasizing the obligation to "seek out" controversial issues. Obligations of Broadcast Licensee Under the Fairness Doctrine, 35 Fed.Reg. 7820 (1970). But, as the Commission says, the proposed rules would be but a "modest * * * step in promoting access to the media." Id. at 7821. They go little beyond the present obligation to give "full" coverage to controversial issues. Such an obligation is inherently difficult to define and enforce. At best, the Commission can evaluate only the general willingness of a licensee to "seek out" issues and glaring examples of noncoverage of obviously important issues. The Commission cannot be expected to engage licensees in fine debates over coverage of less obviously life-or-death issues. But the fundamental point-the point we emphasize-is that no matter how "fully" controversial issues might be covered in a perfect broadcasting world, the basic initiative and control remains with the licensee. Because there is not even a partial "free market" opening to the public at large, the crucial First Amendment interests in decentralized initiative and control go unsatisfied
 We realize that there is another possible, but purely speculative, reformation of the fairness doctrine now under consideration which might be supposed to obviate the need for a measure of "free market" access to advertising time. It has been proposed that licensees be required to provide self-edited advertising time to groups or individuals under the fairness doctrine only when a commercial advertiser has already taken a controversial position in his broadcast messages. Such an approach has been taken regarding cigarette advertisements, though that case was said to be extraordinary and not to establish a general precedent. Banzhaf v. F.C.C., 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968). But even if that principle were made to apply generally, it would leave the initiative solely in the hands of commercial advertisers: the only issues on which noncommercial groups and individuals could speak through editorial advertisements would be those issues which commercial advertisers had already chosen to raise themselves. Allowing such a narrow group, motivated largely by business profit, to set the agenda for editorial advertising is unconscionable and contrary to First Amendment precepts. It is crucial that noncommercial groups and individuals have the same rights of initiative as commercial advertisers.
 
 
 [35]
 The guarantees of full and fair coverage have proved particularly difficult to define and enforce in the past. They have taken on effective meaning only in the most extreme cases of broadcaster irresponsibility. For a depressing critique of the Commission's apparent inability to enforce its own standards, see Cox & Johnson, Broadcasting in America and the FCC's License Renewal Process: An Oklahoma Case Study, 14 F.C.C.2d 1 (1968)
 
 
 [36]
 Even then, however, the special attributes of editorial advertising would not be eliminated by the broadcaster's own coverage. See text at pages 655-656 supra & pages 657-658 infra
 
 
 [37]
 In Lee v. Board of Regents of State Colleges, W.D.Wis., 306 F.Supp. 1097 (1969), affirmed, 7 Cir., 441 F.2d 1257 (1971), the court held that a school newspaper was obliged under the First Amendment to print antiwar editorial advertising, even though antiwar views could be printed in the newspaper's news and letter-to-the-editor columns. The court stressed the qualitative-and valuable-difference in expression of views through an editorial advertisement. "It is readily apparent," it said, "that a paid advertisement can be cast in such a form as to command much greater attention than a letter to the editor. Large type, photographs, repeated publication and full pages of space are some of the modes of expression available in an editorial advertisement that might not be available in a letter to the editor." Id. at 1101. Another court has come to the same result in a newspaper editorial advertising case. Zucker v. Panitz, S.D.N.Y., 299 F.Supp. 102 (1969). See text at pages 659-660 infra
 
 
 [38]
 Commercial advertising-indeed, any sort of commercial speech-is less fully protected than other speech, because it generally does not communicate ideas and thus is not directly related to the central purpose of the First Amendment. See Breard v. City of Alexandria, 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951); Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942)
 
 
 [39]
 DNC's position is somewhat ambiguous. The ruling which it requested from the Commission would, by its terms, apply to all broadcasters, whether or not they accept any advertising. See text at page 647 supra. However, on appeal DNC's arguments have been focused entirely on broadcasters who do already accept noncontroversial advertising. The interests of particular licensees in keeping all advertising off the air were not explored before the Commission or before this court-for example, an all music station may have a very substantial interest in broadcasting no paid announcements. Because the special issues relating to such licensees were not presented here, we do not decide them
 
 
 [40]
 See, e. g., Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Wolin v. Port of New York Authority, supra Note 24. See generally Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1
 
 
 [41]
 Most of the cases, other than those cited above in text, have involved access to particular places in order to perform expressive activities such as speaking, leafleting, or demonstrating in some fashion. For general discussions of the cases and the principles applied, see H. Kalven, The Negro and the First Amendment (paper ed. 1965); Note, Regulation of Demonstrations, 80 Harv.L.Rev. 1773 (1967). There is no reason why the general principles applied in cases involving access to places should not apply to our cases involving access to a particular medium of expression. See Note 24 supra
 
 
 [42]
 Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965)
 
 
 [43]
 Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)
 
 
 [44]
 For discussions of the First Amendmentequal protection intersection, see Blasi, Prior Restraints on Demonstrations, 68 Mich.L.Rev. 1482, 1492-1497 (1970); Kalven, supra Note 40, 1965 Sup.Ct.Rev. at 29-30; Van Alstyne, Political Speakers at Universities: Some Constitutional Considerations, 111 U.Pa.L.Rev. 328, 337-339 (1963)
 
 
 [45]
 In Wirta v. Alameda-Contra Costa Transit District, 64 Cal.Rptr. 430, 434 P.2d 982, 986 (1967), the California Supreme Court came to the same conclusion as we do on this issue, saying:
 "* * * The vice is not that the district has preferred one point of view over another, but that it chooses between classes of ideas entitled to constitutional protection, sanctioning the expression of only those selected, and banning all others. Thus the district's regulation exercises a most pervasive form of censorship.
 "* * * [T]he district's policy * * affords total freedom of the forum to mercantile messages while banning the vast majority of opinions and beliefs extant which enjoy First Amendment protection because of their non-commercialism. No statistical data is required to demonstrate that in the totality of man's communicable knowledge, that which bears no relationship to material value preponderates."
 The Supreme Court of Washington specifically adopted this view in Hillside Community Church, Inc. v. City of Tacoma, 76 Wash.2d 63, 455 P.2d 350, 353 (1969).
 
 
 [46]
 Commissioner Johnson commented in his dissent that broadcasters "have created a system in which immediate access is granted to one, privileged class of applicants: the commercial peddler of goods and services. * * * We have an individual right of access, all right, but only for hucksters of industrial garbage." Democratic National Committee, supra Note 1, 25 F.C.C.2d at 233
 
 
 [47]
 See Banzhaf v. F.C.C., 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968); Green v. F.C.C., 144 U.S.App.D.C. 353, 447 F.2d 323 (1971)
 
 
 [48]
 In Wirta v. Alameda-Contra Costa Transit District, supra Note 45, 64 Cal. Rptr. at 435, 434 P.2d at 987, the California Supreme Court made the same point very forcefully, and provided several telling examples:
 "* * * A lumber company may advertise its wood products, but a conservation group cannot implore citizens to write to the President or Governor about protecting our natural resources. An oil refinery may advertise its products, but a citizens' organization cannot demand enforcement of existing air pollution statutes. An insurance company may announce its available policies, but a senior citizens' club cannot plead for legislation to improve our social security program."
 
 
 [49]
 See generally C. Waxman (ed.), The End of Ideology Debate (1969)
 
 
 [50]
 Statement of attorney for intervenor Columbia Broadcasting System at oral argument before this court
 
 
 [51]
 Brief for the Commission in Case No. 24,537 at p. 12
 
 
 [52]
 47 U.S.C. Sec. 153(h) (1964). The Commission and intervenors argue that this "common carrier" provision would be declared unconstitutional if we were to decide for petitioners in these cases. That, of course, is absolutely incorrect. The Commission and intervenors also point to a part of the Communications Act providing that if a station permits one candidate for office to use its facilities, it must then permit others equal time, but providing also that "[n]o obligation is imposed upon any licensee to allow the use of its station by any such candidate." 47 U.S.C. Sec. 315(a) (1964). This statutory provision squares perfectly with our holding that a broadcaster is not necessarily obliged to provide any time for advertisements, but that if he does sell some advertising time he may not totally exclude editorial advertising
 
 
 [53]
 See, e. g., Amalgamated Food Employees Union Local 590 v. Logan Valley Plaza, Inc., supra Note 15, 391 U.S. at 320, 88 S.Ct. 1601, 20 L.Ed.2d 603; Note, supra Note 33 at 563
 
 
 [54]
 In the context of regulating demonstrations or picketing, guidelines which limit access because the same or similar groups had already has substantial access would be unusual and perhaps impermissible. However, the interest in maintaining some degree of balance on the broadcast media is particularly great. And "the characteristics of news media justify differences in the First Amendment standards applied to them." Red Lion Broadcasting Co. v. F.C.C., supra Note 7, 395 U.S. at 386, 89 S.Ct. at 1805
 
 
 [55]
 We note that the Commission's requirement of free time for antismoking was administered generously toward the financial concerns of licensees and, indeed, few broadcasters seem to have been deterred from accepting cigarette commercials as a result. See National Broadcasting Co., Inc., 16 F.C.C.2d 947 (1969)
 
 
 [56]
 See Note: Fairness Doctrine: Television as a Marketplace of Ideas, 45 N.Y.U.L.Rev. 1222, 1249 (1970). We must be somewhat skeptical of the talk about financial disaster. For, according to Commissioner Johnson, television broadcasters at least "average a 90 to 100 percent return on tangible investment annually." N. Johnson, How to Talk Back to Your Television Set 65 (1969). (Emphasis in original.)